892 F.2d 1419
 Helen LIU, in her individual capacity, as heir and special
administrator of the estate of Henry Liu, and as
guardian ad litem for George Liu,
Plaintiff-Appellant,
v.
The REPUBLIC OF CHINA, Defendant-Appellee.
 No. 87-2976.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 14, 1988.
Decided Dec. 29, 1989.
 
 Gerard E. Harper and Arthur L. Liman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Jerome Garchik, San Francisco, Cal., for plaintiff-appellant.
 Daniel K. Mayers and David Westin, Wilmer, Cutler & Pickering, Thomas G. Corcoran, Jr., Corcoran, Youngman & Rowe, Washington, D.C., John S. Martel, Farella, Braun & Martel, San Francisco, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before HUG, TANG and BOOCHEVER, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 OVERVIEW
 
 1
 Two gunmen acting on orders of Admiral Wong Hsi-ling (Wong), Director of the Defense Intelligence Bureau (DIB) of the Republic of China (ROC), shot and killed Henry Liu in Daly City, California. Helen Liu (Liu), his widow, appeals the district court's dismissal of her complaint for damages against the ROC. Liu asserted claims against the ROC and various individuals for wrongful death under California law, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1964, and under 42 U.S.C. §§ 1985(3) and 1986 of the Civil Rights Acts. Because of the district court's concern with the act of state doctrine, it ordered Liu to file a motion for partial summary judgment relying solely on the findings of the ROC tribunals in criminal cases arising out of the murder. The district court held that the ROC could not be held vicariously liable under California law because Wong's act of ordering Henry Liu's assassination was outside the scope of his employment, and that the act of state doctrine precluded Liu from piercing the findings of the ROC tribunals.
 
 
 2
 We reverse and remand.
 
 PROCEEDINGS IN THE DISTRICT COURT
 
 3
 In her complaint Liu asserts that the ROC was involved in the conspiracy to kill Henry Liu. The ROC filed a motion based on the act of state doctrine to dismiss it as a party defendant. The district court denied this motion initially to give Liu a chance to establish that, based on the findings of the ROC courts, the ROC was liable under the doctrine of respondeat superior. Liu v. Republic of China, 642 F.Supp. 297 (N.D.Cal.1986).
 
 
 4
 The district court denied Liu's motion for partial summary judgment and granted the ROC's motion to dismiss it as a party defendant on act of state grounds. The district court held that Wong's act was not incidental to his duties as Director of the DIB, or reasonably foreseeable to the ROC.
 
 
 5
 The district court also held that the act of state doctrine precluded an American court from piercing the findings of the ROC tribunals. The court found that the ROC decisions were "acts of state" because the judgments represented "an exercise of the ROC's jurisdiction to give effect to its public interests in assessing responsibility for the murder." Additionally, the district court held that the doctrine applied because the intrusive discovery necessary in this case would involve the judiciary in the most sensitive areas of a foreign nation's national security and intelligence affairs.
 
 
 6
 Pursuant to Fed.R.Civ.P. 54(b), the district court entered a final judgment dismissing the ROC as a party defendant after finding that there was no just reason for delay. Liu filed a timely notice of appeal.
 
 FACTS
 
 7
 Liu was ordered by the district court to submit a motion for partial summary judgment limiting the facts to the findings of the ROC courts. Based on those findings it appears that the two gunmen, Wu Tun (Wu), and Tung Kuei-sen, (Tung), were members of the Chinese Bamboo Union Gang of criminals. Chen Chi-li, an alleged leader of the Bamboo Union Gang, recruited these two men to kill Henry Liu.[1] At this time, Chen Chi-li was working for the DIB, under its Director, Wong.
 
 
 8
 In May of 1984, Wong met Shuai Yueh-feng (Shuai), a member of the Bamboo Union Gang. Shuai told Wong that the gang had useful connections in the United States and Hong Kong, and could assist the DIB in extending its operations on the Chinese mainland. Shuai, however, recommended that Wong contact Chen Chi-li, the leader of the gang. Wong met Chen Chi-li at a party in July of 1984. Wong later invited Chen Chi-li and Shuai to a DIB guest house in August of 1984. At this meeting Chen Chi-li and Shuai agreed to work for the DIB.
 
 
 9
 At the same meeting, Chen Chi-li and Wong discussed Henry Liu. Wong complained about the Chinese people overseas who criticized the ROC after they had received favorable treatment in Taiwan. Wong used Henry Liu as an example of this type of "ungrateful" Chinese person. Chen Chi-li stated that such people should be "taught a lesson," and that he could be trusted with such an assignment. Wong agreed that Henry Liu should be "given a lesson" once the opportunity presented itself.
 
 
 10
 At the August meeting, Chen Chi-li and Shuai also requested intelligence training at the DIB's training center. Wong agreed and sent both men to the DIB's school for a four-day training session. Wong visited Chen Chi-li at the training center, and Chen Chi-li again brought up the subject of teaching Henry Liu a lesson. Chen Chi-li asked for background information on Liu, and Wong promised to send this information to him later.
 
 
 11
 In September of 1984, Wong ordered a subordinate, Hu Yi-men, to obtain the information file on Henry Liu from a department of the DIB. Wong directed Chen Hu-men, another subordinate, to deliver the file to Chen Chi-li, and appointed Chen Hu-men to be Chen Chi-li's and Shuai's DIB contact. Chen Chi-li and Shuai then went to the United States to assassinate Henry Liu. In September, Chen Chi-li and Shuai decided that any attempt on Liu while he was at work would be too dangerous due to police monitoring of a strike in the nearby area. Chen Chi-li reported this development to Chen Hu-men, and stated that Henry Liu would be taken care of later.
 
 
 12
 At the end of September Chen Chi-li recruited Wu and Tung to murder Liu. These plans were also relayed to Chen Hu-men and Wong by Shuai. On October 15, 1984, Chen Chi-li telephoned Chen Hu-men and informed him of Liu's murder by using these code words: "The deal is concluded; the effect will become clear tomorrow." Chen Chi-li, Wu, and Tung were ordered to return to Taiwan as soon as possible. The three men were met by Chen Hu-men at the airport in Taiwan on October 21, 1984. Three days later Chen Chi-li and Shuai attended another dinner at the DIB guest house. Chen Chi-li reported the murder to Wong, and Wong offered him $20,000, which Chen Chi-li refused.
 
 
 13
 Wong, Chen Hu-men, and another DIB employee were convicted by ROC military courts of conspiracy for their part in the Henry Liu murder. The trial court issued an opinion, and on appeal, the Superior Appellate Review Court of the Ministry of National Defense affirmed the convictions in a published opinion. Chen Chi-li and Wu were convicted of homicide in separate proceedings before the civilian courts of the ROC. The trial court, the Taiwan High Court (the intermediate appellate court), and the Supreme Court of Taiwan all issued opinions in Chen Chi-li's and Wu's convictions.
 
 
 14
 These courts never explicitly stated that no other ROC officials were involved. That finding is implicit, however, in the courts' decisions. One ROC court stated: "[w]hen the murder of Henry Liu proceeded to become a major story in both the Chinese and English-language press in the United States, Wong finally began to perceive the seriousness of the consequences; but he never had the courage to report the situation to his superiors." The courts stated that ROC officials discovered Wong's role in the murder only after Chen Chi-li, during an interrogation about an unrelated matter, implicated him and his subordinates.
 
 
 15
 Henry Liu was an historian and journalist who had published several articles critical of Taiwan's one-family rule. Some of these articles were consolidated into a book entitled The Biography of C.K. Chiang, which was banned in the ROC but otherwise published and distributed worldwide. The military trial court stated:
 
 
 16
 During the extended conversation [between Wong and Chen Chi-li], the topic shifted to overseas Chinese and their various activities in the United States, and Wong mentioned then that some people, once educated here and favorably treated in this country, frequently engaged in spoken and written attacks on the country; he [Wong] indicated that this was much to be regretted.
 
 
 17
 Wong Hsi-ling had learned [via a letter] from a friend, Hsia Hsiao-hue [Hsia], in June, that Henry Liu was not happy with him and would initiate some action detrimental to Wong. Because Wong was concerned with trying to prevent such action by Liu, he cited Liu as an illustration, specifically pointing out that Liu was such a man, educated here and favorably treated by the people of this country, but so ungrateful he frequently turned out writings that denigrated this government and smeared this country's image.
 
 
 18
 Thus apprised of Wong's dissatisfaction with Liu, Chen Chi-li now immediately echoed Wong's sentiment, declaring that, "This kind of person should be taught a lesson. I can be trusted with the assignment." Wong responded, "when the opportunity arises, he should be given a lesson."
 
 
 19
 Hsia's letter was destroyed, and the ROC courts never stated explicitly whether Liu's alleged grievance with Wong was based on his official performance or some other personal matter between the men.
 
 
 20
 Later in its opinion, however, the trial court stated: "[d]efendant Wong Hsi-ling, from the base of his personal impression of, and individual grudge against Henry Liu ... grossly misuse[d] his office to employ without seeking official authorization, the criminal organization leader Chen Chi-li...." This finding was reiterated by the Superior Appellate Review Court of the Ministry of National Defense. "It [the trial court opinion] stipulates that Wong, in order to stop Henry Liu from initiating actions to Wong's disadvantage on the basis of a personal grudge between them, accepted Chen Chi-li's offer to teach Henry Liu a 'lesson.' "
 
 
 21
 The district court found that Wong had a mixed motive in ordering the murder of Henry Liu. The district court stated:
 
 
 22
 The [ROC] courts found that Wong believed Liu was damaging the ROC by both words and deeds. The courts also found that Wong knew Liu was not satisfied with his performance as the Director of the DIB, that Liu had some materials that were not advantageous to him, and that Liu was going to initiate some action that would be detrimental to him.
 
 DISCUSSION
 I. STANDARD OF REVIEW
 
 23
 Initially we must decide whether there was subject matter jurisdiction over the ROC under the Foreign Sovereign Immunities Act of 1976 (FSIA), codified in part at 28 U.S.C. §§ 1602-1611 (1982). "Whether subject matter jurisdiction exists is a question of law reviewable de novo." Gerritsen v. de la Madrid Hurtado, 819 F.2d 1511, 1515 (9th Cir.1987).
 
 
 24
 The district court granted summary judgment to the ROC on the issue of respondeat superior based on its interpretation of the ROC courts' factual findings and its interpretation of California law. We review a district court's grant of summary judgment de novo. T.W. Elec. Serv. v. Pacific Elec. Contractor's Ass'n, 809 F.2d 626, 629-30 (9th Cir.1987).
 
 
 25
 The district court dismissed the ROC as a party defendant based on its application of the act of state doctrine. Surprisingly, there is no Ninth Circuit case, or any other case that we could find, specifying the standard of review for a district court's decision to apply the act of state doctrine in a given case. Implicitly, however, it appears that appellate courts have reviewed de novo the applicability of this doctrine in a given case. See generally Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (reversing a court of appeals decision that held the act of state doctrine was not implicated in a case challenging Cuba's expropriation of property because Cuba's expropriation was in violation of international law. The Supreme Court did not defer to the district court's or the court of appeal's decision but independently analyzed whether the act of state doctrine was applicable to expropriations of property.). De novo review is also consistent with the analytical framework established by this court in United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In McConney, we noted two policy objectives for reviewing a district court's factual determinations for clear error: 1) the superior position of the trial judge to resolve factual disputes; and 2) the corresponding conservation of appellate resources to decide issues "that appellate courts in turn are best situated to decide." Id. Trial courts are not in a superior position to appellate courts to decide whether a given case implicates the act of state doctrine. Moreover, by reviewing the applicability of the act of state doctrine in a given case de novo, we ensure that the risk of judicial error in these cases is reduced because "the judgment of at least three members of an appellate panel is brought to bear on every case." Id. Consequently, we review the district court's decision concerning the act of state doctrine de novo.
 
 
 26
 II. JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITY ACT
 
 
 27
 The FSIA is "the sole basis for obtaining [subject matter] jurisdiction over a foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 109 S.Ct. 683, 688 (1989). See H.R.Rep. No. 94-1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Admin.News 6604, 6610. 28 U.S.C. § 1604 (1982) generally provides that foreign states are immune from suit in the United States except as provided in sections 1605 to 1607. Similarly, section 1330(a) confers original jurisdiction on district courts over "any non-jury civil action against a foreign state ... for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605-1607...." 28 U.S.C. § 1330(a) (1982). Consequently, this suit must fit within one of the exceptions to immunity listed in sections 1605-1607 or this court lacks jurisdiction and the ROC is immune from suit.
 
 Section 1605(a) provides that:
 
 28
 [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
 
 
 29
 * * *(5) not otherwise encompassed in paragraph (2) above [commercial activities], in which money damages are sought against a foreign state for personal injury or death, ..., occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment....
 
 
 30
 28 U.S.C.A. § 1605(a)(5) (West Supp.1989) (emphasis added). This exception does not apply, however, to claims based upon the exercise of or failure to exercise a discretionary function. 28 U.S.C.A. § 1605(a)(5)(A) (West Supp.1989).
 
 A. Tortious Activity
 
 31
 Liu's allegations were sufficient to bring this suit within the tortious activity exception of 28 U.S.C.A. § 1605(a)(5). Liu sued for damages for the wrongful death of her husband which occurred within the United States. Section 1605(a)(5) removes immunity for torts committed either by a foreign state or its agents acting within the scope of their employment. Liu alleged both grounds: 1) that the ROC was involved in the conspiracy to kill Henry Liu; and 2) that Wong acted within the scope of his employment in ordering the assassination.
 
 
 32
 The district court eventually ruled that the act of state doctrine precluded inquiry into the alleged ROC involvement in the conspiracy and that Wong's act was not committed within the scope of his employment under California law. Consequently the court held that the ROC was not liable under the doctrine of respondeat superior for Liu's damages. This determination constituted a decision that the district court lacked subject matter jurisdiction because section 1605(a)(5) requires that acts of agents of a foreign state be within the scope of their employment.
 
 
 33
 "The 'scope of employment' provision of the tortious activity exception [of the FSIA] essentially requires a finding that the doctrine of respondeat superior applies to the tortious acts of individuals." Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018, 1025 (9th Cir.1987), cert. denied, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). In Joseph, we held that state law, not federal common law, governs whether an employee's action is within the scope of employment in determining the applicability of the FSIA. Id. See also Skeen v. Federative Republic of Brazil, 566 F.Supp. 1414, 1417 (D.D.C.1983) (citing First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2598 n. 11, 77 L.Ed.2d 46 (1983)).
 
 
 34
 Whether the ROC is liable under respondeat superior is crucial not only to the issue of the court's jurisdiction, but also to the merits of the appeal from the denial of Liu's motion for partial summary judgment on the wrongful death claim. Section 1606 of the FSIA provides:
 
 
 35
 As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages....
 
 
 36
 28 U.S.C. § 1606 (1982). The FSIA does not create a federal rule of liability to be applied in an action involving a foreign state.
 
 
 37
 There are two choice of law questions that must be resolved prior to determining whether the ROC is liable under respondeat superior. First, we must decide the choice of law rule applicable to the respondeat superior issue determinative of jurisdiction under the FSIA. Second, assuming that we have jurisdiction under that Act, we must ascertain the law to be applied in determining whether the ROC is liable on the merits.
 
 
 38
 We have held that federal common law provides the choice of law rule applicable to deciding the merits of an action involving a foreign state. See Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1003-04 (9th Cir.1987). In Harris, the parents of a passenger killed in an airplane crash in Poland sued the Polish airline in federal court in California. The FSIA applied to the suit because the Polish airline was an instrumentality of the state of Poland. The plaintiffs argued that California's choice of law rules should determine the substantive law of damages because the parties sued in California. We rejected this argument and held that federal common law provided the appropriate choice of law rule in cases arising under the FSIA. Id. at 1003. We adopted the Restatement (Second) of Conflicts of Laws (1969) approach, which creates a presumption that "the law of the place where the injury occurred applies" unless another state has a "more significant relationship to the [tort] and to the parties." Id. at 1003-04; see also Restatement (Second) of Conflicts of Law § 175 (1969). Consequently, we held that the substantive law of Poland applied because the accident occurred in Poland and "Poland's relationship to this action is at least as significant as California's." Harris, 820 F.2d at 1004.
 
 
 39
 In Joseph, a landlord sued in California district court for damages to a house, located in California, that was rented to a Nigerian consular officer. On interlocutory appeal, Nigeria claimed that the court lacked jurisdiction under the FSIA. We held that California's law of respondeat superior, not federal common law, applied to determine whether the tortious acts of Nigeria's employees were within the scope of employment for purposes of the tortious activity exception in the FSIA. Joseph, 830 F.2d at 1025. Understandably, in Joseph we never discussed which choice of law rule we applied because California was the place of the forum, the place of injury, and the place where the tortious act or omission occurred.
 
 
 40
 Our decision in Joseph can be reconciled with Harris, because Joseph did not explicitly reject federal common law's applicability in determining the appropriate choice of law rule for cases arising under the FSIA. Consequently, we apply the federal choice of law rule to determine the applicable law of respondeat superior on the merits. If a different choice of law rule applied to determine the applicable respondeat superior law for jurisdictional purposes under the FSIA, it would be cumbersome, present grave practical difficulties, and could result in different substantive laws being applied in the same suit. We do not believe that Congress intended different choice of law rules to apply. We therefore hold that the federal choice of law rule controls the applicable law of respondeat superior both for jurisdiction under the FSIA and on the merits.
 
 
 41
 California is the place where the injury occurred, and under the federal choice of law rule, its law will apply to the merits of the action unless the ROC has a more significant relationship to the tort and the parties. Although the ROC has some connection with the tort and the parties, we cannot say that it has the more significant relationship. California and the ROC have offsetting interests in the parties to this suit: Henry Liu was domiciled in California when he was killed, and the ROC and other ROC nationals are parties to the suit. California, however, has a significant interest in ensuring that its residents are compensated for torts committed against them, and in discouraging the commission of such torts within its borders. We conclude that California's relationship to the tort is at least as significant as the ROC's. See Harris, 820 F.2d at 1004. Consequently, based on the federal choice of law rule, California's law of respondeat superior will determine whether Wong's act was within the scope of his employment for purposes of jurisdiction under the FSIA and on the merits.
 
 B. Respondeat Superior
 
 42
 An employer is vicariously liable for the torts of employees committed within the scope of their employment. See, e.g., Alma W. v. Oakland Unified School Dist., 123 Cal.App.3d 133, 138-39, 176 Cal.Rptr. 287, 289 (1981). " 'This includes willful and malicious torts as well as negligence.' " John R. v. Oakland Unified School Dist., 48 Cal.3d 438, 447, 769 P.2d 948, 953, 256 Cal.Rptr. 766, 771 (1989) (quoting Martinez v. Hagopian, 182 Cal.App.3d 1223, 1227, 227 Cal.Rptr. 763, 766 (1986)).
 
 
 43
 California follows the "enterprise theory" of liability:
 
 
 44
 California has adopted the rationale that the employer's liability should extend beyond his actual or possible control over the employees to include risks inherent in or created by the enterprise because he, rather than the innocent injured party, is best able to spread the risks through prices, rates or liability insurance.
 
 
 45
 Rodgers v. Kemper Constr. Co., 50 Cal.App.3d 608, 618, 124 Cal.Rptr. 143, 148 (1975); see also Carr v. Wm. C. Crowell Co., 28 Cal.2d 652, 656, 171 P.2d 5, 7 (1946); Perez v. Van Groningen & Sons, 41 Cal.3d 962, 969, 719 P.2d 676, 678, 227 Cal.Rptr. 106, 109 (1986) (employer liable for employee's negligence even when employee violated express company rule). A country such as the ROC cannot spread risks like a private business by means of the prices it charges for a product. But by means of the public fisc, it similarly can spread risks which would otherwise fall on the individual harmed by the tortious conduct of the country's employees. See generally John R., 48 Cal.3d at 450-51, 769 P.2d at 955, 256 Cal.Rptr. at 773.
 
 
 46
 California has established a two-prong test to determine whether an employee is acting within the scope of employment. Generally, an employer will be liable for an employee's wrongful act if 1) the act was required or incident to the employee's duties or 2) the act was reasonably foreseeable to the employer. See Alma W., 123 Cal.App.3d at 139, 176 Cal.Rptr. at 289; see also Perez, 41 Cal.3d at 967-68, 719 P.2d at 678-79, 227 Cal.Rptr. at 108-09. In this case, we find that Liu has established facts sufficient to meet the first prong of the test and therefore do not address the issue of foreseeability. Although the issue of scope of employment is ordinarily a question of fact, "the issue becomes a question of law when the facts are undisputed and no conflicting inferences are possible." Perez, 41 Cal.3d at 968, 719 P.2d at 679, 227 Cal.Rptr. at 109.
 
 
 47
 "In assessing whether an employee's wrongful act was required by or incidental to his duties, the law defines occupational duties broadly." Alma W., 123 Cal.App.3d at 139, 176 Cal.Rptr. at 289. "If an employee[, however,] substantially deviates from his duties for personal purposes, the employer is not vicariously liable for the employee's actions." Id.; see also Hinman v. Westinghouse Elec. Co., 2 Cal.3d 956, 960, 471 P.2d 988, 990, 88 Cal.Rptr. 188, 190 (1970); Carr, 28 Cal.2d at 656, 171 P.2d at 8; Golden West Broadcasters, Inc. v. Superior Court, 114 Cal.App.3d 947, 957, 171 Cal.Rptr. 95, 100 (1981).
 
 
 48
 The ROC contends that it is not liable for Wong's action because the ROC courts expressly found that Wong was motivated by a personal grudge to kill Henry Liu. The district court stated that:
 
 
 49
 The [ROC] courts found that Wong believed Liu was damaging the ROC by both words and deeds. The courts also found that Wong knew Liu was not satisfied with his performance as the Director of the DIB, that Liu had some materials that were not advantageous to him, and that Liu was going to initiate some action that would be detrimental to him.
 
 
 50
 The ROC contends that the courts actually found that Wong used this "ostensible nationalism" story only to persuade Chen Chi-li to murder Henry Liu, but did not actually believe this himself. The ROC courts, however, never stated that the "nationalism" story was merely a guise to lure Chen Chi-li into murdering Henry Liu. We agree with the district court's interpretation of these findings. Henry Liu was an historian and journalist who had criticized ROC leaders in the past. It is logical to assume that the action Henry Liu was going to take against Wong was another article criticizing another ROC leader, in this case Wong. Wong's response might be considered motivated by a personal grudge under the internal law of the ROC; however, under California law it is sufficiently job related to impose vicarious liability on the ROC. See Carr, 28 Cal.2d at 656-57, 171 P.2d at 8.
 
 
 51
 In Carr, the California Supreme Court held that an employer was liable for its employee's act of throwing a hammer at the plaintiff, a subcontractor's employee, after the plaintiff had criticized the other's work. The supreme court stated:
 
 
 52
 Not only did the altercation leading to the injury arise solely over the performance of Enloe's duties, but his entire association with plaintiff arose out of his employment on the building under construction. He had never seen plaintiff before the day preceding the accident, and had never conversed with him before the dispute over the plate. He testified in addition ... that he had no personal grudge against [the plaintiff].
 
 
 53
 Id. at 657, 171 P.2d at 8; see also Martinez v. Hagopian, 182 Cal.App.3d 1223, 1230, 227 Cal.Rptr. 763, 767 (1986) (the employer was not vicariously liable because "[t]his assault arose out of an argument between the visitors and the workers concerning one worker's treatment of a visitor's wife. The dispute had no connection with any aspect of harvesting grapes.").
 
 
 54
 In this case, the dispute between Liu and Wong arose out of Liu's dissatisfaction with Wong's performance as Director of the DIB. There is no evidence of any personal altercation unrelated to Wong's official duties. We see no principled distinction between this case, where Wong acted in part to prevent Liu's criticism of his performance as Director of the DIB, and the employee in Carr who intentionally threw a hammer after another person criticized his work.
 
 
 55
 Even if we assume, despite the absence of evidence, that Wong acted partly out of a personal grudge "not engendered" by his employment as a high official in the ROC government, California courts have made clear that a "mixed motive" is sufficient to impose vicarious liability on the employer. See John R., 48 Cal.3d at 447, 769 P.2d at 953, 256 Cal.Rptr. at 771 (" 'where the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer.' " (quoting Lockheed Aircraft Corp. v. Industrial Accident Comm'n, 28 Cal.2d 756, 758-59, 172 P.2d 1, 3 (1946)); see also Alma W., 123 Cal.App.3d at 140, 176 Cal.Rptr. at 290 ("Though there may be those cases where personal motivations so mingle with the employee's pursuit of occupational duties that it is arguable whether the employee's action is incidental to his duties, this is not such a case.").
 
 
 56
 The ROC courts' findings indicate that Wong acted in part to benefit the ROC. The courts stated that Wong believed that Henry Liu was damaging the ROC by his criticism of its government. Wong apparently believed that it would benefit the ROC to silence a known critic. We realize that the ROC incurred no benefit but rather suffered substantial detriment and embarrassment from Wong's act. Nevertheless, if Wong's complicity in the assassination had not been revealed, the ROC would have benefited from the silencing of a critic. If actual benefit, from the standpoint of hindsight, were required respondeat superior would practically be eliminated because damages usually offset any benefit.
 
 
 57
 California no longer requires that an act benefit the employer before vicarious liability will attach. See Perez, 41 Cal.3d at 969, 719 P.2d at 679, 227 Cal.Rptr. at 109-10. It does not follow, however, that benefit to the employer "must be eliminated as a relevant factor determining whether conduct falls within the 'scope of employment.' " Childers v. Shasta Livestock Auction Yard, Inc., 190 Cal.App.3d 792, 805, 235 Cal.Rptr. 641, 647 (1987) (actual benefit is still a relevant factor in determining whether an employee's act is within the scope of employment). Similarly, the employee's intent should also be a relevant factor in determining whether conduct is within the scope of employment. See Restatement (Second) of Agency § 228 at 504 (1958) (listing as one factor whether "[conduct] is actuated, at least in part, by a purpose to serve the master"); accord United States v. Beusch, 596 F.2d 871, 877 (9th Cir.1979) ("The acts of an agent may be imputed to the principal, but only if it is the agent's purpose to benefit the principal, thus bringing his acts within the scope of his employment." (citations omitted)). We believe that California courts would recognize that the intent of the employee is a relevant factor in determining whether an employee's act was wholly personal or sufficiently connected with the employment to justify shifting the risk of loss to the enterprise. The employee's intent is especially relevant when the act is an intentional tort which, if discovered, will rarely actually benefit the employer. See Perez, 41 Cal.3d at 969, 719 P.2d at 679, 227 Cal.Rptr. at 109-10.
 
 
 58
 Another factor present in this case is that Wong used the ROC facilities entrusted to him to help Chen Chi-li and Shuai prepare for the assassination. Wong sent both men to the DIB training school for four days, and provided them with a dossier on Liu prepared by the DIB. As the ROC correctly states, the mere use of facilities entrusted to the employee is insufficient to impose liability on the employer. See Alma W., 123 Cal.App.3d at 140, 176 Cal.Rptr. at 290 ("Where an employee pursues his own ends, the use of property or facilities entrusted to him ... is an inadequate basis for imputing liability to the employer" (emphasis added)). Although Wong's use of facilities alone would be insufficient to impute liability to the ROC, this factor combined with Wong's use of his authority to accomplish a task, partly for the benefit of his employer, is sufficient to impose vicarious liability on the ROC.
 
 
 59
 In White v. County of Orange, 166 Cal.App.3d 566, 212 Cal.Rptr. 493 (1985), the court held that a municipality could be held vicariously liable for a deputy sheriff's misuse of his authority. A policeman stopped a woman, and without explanation, placed her in his patrol car and drove to an isolated area. The deputy repeatedly threatened to rape and murder her. Several hours later, he returned the woman to her car after she promised to go on a date with him. The court stated that:
 
 
 60
 A police officer is entrusted with a great deal of authority. This authority distinguishes the situation here from the facts of Alma W. Unlike a school custodian, the police officer carries the authority of the law with him into the community.... The officer's method of dealing with this authority is certainly incidental to his duties; indeed, it is an integral part of them.
 
 
 61
 White, 166 Cal.App.3d at 571, 212 Cal.Rptr. at 496.
 
 
 62
 The district court refused to follow White "because it is poorly reasoned and lacks any meaningful analysis." The district court also stated that White had not been followed by any other cases. The district court was also concerned that White would, in effect, make a government liable whenever employees misused their office to commit torts. The ROC cites numerous cases for the proposition that White is not good law in California. We find those cases distinguishable on the facts.
 
 
 63
 All of the cases cited by the ROC involved sexual assaults committed by employees. See John R., 48 Cal.3d 438, 769 P.2d 948, 256 Cal.Rptr. 766 (school district not vicariously liable for a school teacher's alleged molestation of a student); see also Jeffrey E. v. Central Baptist Church, 197 Cal.App.3d 718, 243 Cal.Rptr. 128 (1988) (Baptist Church not liable for a Sunday School teacher's repeated molestation of a child); Rita M. v. Roman Catholic Archbishop of Los Angeles, 187 Cal.App.3d 1453, 232 Cal.Rptr. 685 (1986) (Roman Catholic Church not vicariously liable for priests' alleged sexual contact with a minor parishioner); Alma W., 123 Cal.App.3d 133, 176 Cal.Rptr. 287 (school district not liable for the sexual assault on a student by a school custodian on school property).
 
 
 64
 In all those cases, the courts were concerned with purely personal acts by an employee. In John R., the supreme court stated that "[a] more personal escapade less related to an employer's interests is difficult to imagine." John R., 48 Cal.3d at 447, 769 P.2d at 953, 256 Cal.Rptr. at 771. Likewise the court in Alma W. stated that the employee's action was "prompted by wholly personal motivations, [and] was clearly not required or incidental to his duties as a school custodian." Alma W., 123 Cal.App.3d at 140, 176 Cal.Rptr. at 290. As discussed earlier, Wong's act of ordering the assassination of Henry Liu was not wholly personal but arose from his employment as Director of the DIB. See Carr, 28 Cal.2d at 654, 171 P.2d at 7 ("It is sufficient, however, if the injury resulted from a dispute arising out of the employment").
 
 
 65
 In John R., the California Supreme Court specifically declined to decide whether White was properly decided "or whether the job-created authority theory has any validity in evaluating vicarious liability for the torts of police officers." John R., 48 Cal.3d at 452, 769 P.2d at 956, 256 Cal.Rptr. at 774. Instead, the supreme court found that imposing vicarious liability in the case before it would not advance any of the goals ordinarily served by respondeat superior. Id. at 451-52, 769 P.2d at 955-56, 256 Cal.Rptr. at 773-74. The California Supreme Court has recognized three reasons for imposing liability on an enterprise: " '(1) [I]t tends to provide a spur toward accident prevention; (2) it tends to provide greater assurance of compensation for accident victims, and (3) at the same time it tends to provide reasonable assurance that, like other costs, accident losses will be broadly and equitably distributed among the beneficiaries of the enterprises that entail them.' " Perez, 41 Cal.3d at 967, 719 P.2d at 678, 227 Cal.Rptr. at 108. (quoting 5 F. Harper, F. James & O. Gray, The Law of Torts, § 26.5, at 21 (2d ed. 1986)).
 
 
 66
 The supreme court was concerned that imposition of vicarious liability for a teacher's sexual misconduct with a student would harm the educational enterprise by deterring school districts from encouraging or authorizing teacher-student contacts, and by making insurance harder to obtain and thereby diverting "needed funds from the classroom." John R., 48 Cal.3d at 451, 769 P.2d at 956, 256 Cal.Rptr. at 774. Last, the supreme court refused to spread the loss because "the connection between the authority conferred on teachers to carry out their instructional duties and the abuse of that authority to indulge in personal, sexual misconduct is simply too attenuated to deem a sexual assault as falling within the range of risks allocable to a teacher's employer." Id. at 452, 769 P.2d at 956, 256 Cal.Rptr. at 774 (emphasis added).
 
 
 67
 In this case, we do not find that "the consequences of imposing liability are unacceptable." See id. Imposition of vicarious liability would not undermine the overall effectiveness of a foreign government or its intelligence apparatus. Although a sexual assault by a teacher may be too attenuated to justify spreading the risk of loss to the beneficiaries of the enterprise, an employee's misuse of authority, done in part with the intent to benefit the employer, is within the risks broadly allocable to the enterprise. When an employee, such as Wong, uses governmental authority in a mistaken attempt to benefit his employer by silencing an outspoken critic of the government, there is nothing inequitable about spreading the loss among all the beneficiaries of the government.
 
 
 68
 Last, the ROC contends that it should not be liable for Wong's act because Wong violated ROC internal law prohibiting murder, and none of its other officials knew of or sanctioned his act. First, the mere fact that an employee violated an employer's express rules is not dispositive. See Perez, 41 Cal.3d at 970, 719 P.2d at 679, 227 Cal.Rptr. at 109. If this were a complete defense, then " 'few employers would ever be held liable.' " Id., 719 P.2d at 680, 227 Cal.Rptr. at 110 (quoting W. Prosser & W. Keeton, The Law of Torts 502 (5th ed. 1984)). Likewise, the fact that the ROC officials did not sanction Wong's act or were unaware of it is irrelevant because under respondeat superior an employer is held vicariously liable for the risks inherent in his enterprise irrespective of his own personal fault. Perez, 41 Cal.3d at 967-68, 719 P.2d at 678, 227 Cal.Rptr. at 108.
 
 
 69
 We can accept the ROC courts' findings that no other official was aware of or sanctioned Wong's wrongful act and still find that Liu has established as a matter of law that Wong's act was committed within the scope of his employment as Director of the DIB. Consequently, we reverse the district court's denial of Liu's motion for partial summary judgment and its decision that the ROC could not be vicariously liable for Henry Liu's death.
 
 
 70
 Because we conclude that the ROC is liable under respondeat superior, we also hold that there is subject matter jurisdiction under the FSIA, unless Wong's conduct falls within the discretionary function exception to that act. 28 U.S.C. § 1330(a).
 
 C. Discretionary Function
 
 71
 The existence of a discretionary function under the FSIA is analyzed under the general principles established under the same exception in the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1982). See Joseph, 830 F.2d at 1026; see also Letelier v. Republic of Chile, 488 F.Supp. 665, 673 (D.D.C.1980).
 
 
 72
 In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the Supreme Court established a two-part inquiry for determining whether a government employee's act falls within this exception. First, the courts must determine whether the government employee had any discretion to act or if there was an element of choice as to appropriate conduct. See id., 108 S.Ct. at 1958; see also Arizona Maintenance Co. v. United States, 864 F.2d 1497, 1502 (9th Cir.1989). "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." Berkovitz, 108 S.Ct. at 1959. Second, if the action involves some discretion, then courts must determine whether the exercise of that discretion is " 'grounded in social, economic, and political policy....' " Id. (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)).
 
 
 73
 This exception is inapplicable in this case because Wong had no discretion, according to the ROC courts, to violate the ROC law that prohibits murder. Article 21, paragraph 2 of the Criminal Code of Taiwan provides that: "[a]n act performed by a public official in the course of carrying out his duties and pursuant to the order of his superior is not punishable unless such public official knew that such order was contrary to the law " (emphasis added). In Berkovitz, the Supreme Court stated that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." Id., 108 S.Ct. at 1958-59 (emphasis added). Consequently, we hold that the discretionary function exception is inapplicable when an employee of a foreign government violates its own internal law. See Letelier, 488 F.Supp. at 673 ("Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law.").
 
 III. THE ACT OF STATE DOCTRINE
 
 74
 The act of state doctrine is not a jurisdictional limit on courts, but rather is "a prudential doctrine designed to avoid judicial action in sensitive areas". International Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354, 1359 (9th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). The doctrine has "constitutional underpinnings" related to separation of powers concerns and judicial recognition of "the primary role of the President and Congress in [the] resolution of political conflict and the adoption of foreign policy." Id.; see Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964).
 
 
 75
 "The traditional formulation of the act of state doctrine is that ...:
 
 
 76
 Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."
 
 
 77
 Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 1859 n. 7, 48 L.Ed.2d 301 (1976) (quoting Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897)) (emphasis added). The doctrine, today, is a flexible one designed to prevent judicial pronouncements on the legality of the acts of foreign states which could embarrass the Executive Branch in the conduct of foreign affairs. See Sabbatino, 376 U.S. at 428, 84 S.Ct. at 940; see also Dunhill, 425 U.S. at 697, 96 S.Ct. at 1863. "The 'touchstone' or 'crucial element' is the potential for interference with our foreign relations." OPEC, 649 F.2d at 1360; see Republic of the Philippines v. Marcos, 862 F.2d 1355, 1361 (9th Cir.1988) (en banc), cert. denied, --- U.S. ----, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989) (the doctrine did not apply in a suit against the deposed dictator of the Philippines by the present government because "[t]he doctrine is meant to facilitate the foreign relations of the United States, not to furnish the equivalent of sovereign immunity to a deposed leader.").
 
 
 78
 The burden of proving acts of state rests on the party asserting the applicability of the doctrine. See Dunhill, 425 U.S. at 694-95, 96 S.Ct. at 1861-62; Republic of Philippines, 862 F.2d at 1361. At a minimum, this burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest. See Timberlane Lumber Co. v. Bank of Am. N.T. & S.A., 549 F.2d 597, 607-08 (9th Cir.1976).
 
 
 79
 First, we address whether Liu's suit against the ROC for damages for the assassination of her husband is barred by the doctrine. Although the ROC did not raise this argument, we are concerned with the potential for embarrassing the Executive Branch, and raise the issue sua sponte.
 
 
 80
 In Letelier, 488 F.Supp. at 673-74, Chile argued that even if its officials ordered the assassination of Letelier, those acts would be immune from review under this doctrine because they occurred within Chile, although the assassination occurred in the United States. The court rejected this argument because:
 
 
 81
 To hold otherwise would totally emasculate the purpose and effectiveness of the Foreign Sovereign Immunities Act by permitting a foreign state to reimpose the so recently supplanted framework of sovereign immunity as defined prior to the Act " 'through the back door, under the guise of the act of state doctrine.' "
 
 
 82
 Id. at 674 (quoting H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. 20 n. 1, reprinted in 1976 U.S.Code Cong. & Admin.News, 6604, 6619 n. 1).
 
 
 83
 In OPEC, this court held that the OPEC nations' price fixing activities, although not entitled to sovereign immunity under the FSIA, were acts of state. We held that the FSIA did not supersede the act of state doctrine because the doctrine addressed different concerns than the doctrine of sovereign immunity. OPEC, 649 F.2d at 1359-60. "While the FSIA ignores the underlying purpose of a state's action, the act of state doctrine does not." Id. at 1360. Consequently, the mere fact that the FSIA confers jurisdiction on this court to hear this type of case does not end our inquiry. We must still determine whether the act of state doctrine mandates abstention in cases alleging that a foreign government ordered the assassination of an American citizen in the United States. We conclude that it does not.
 
 
 84
 One factor we must consider is whether the foreign state was acting in the public interest. "When the state qua state acts in the public interest, its sovereignty is asserted. The courts must proceed cautiously to avoid an affront to that sovereignty." Id. Thus, any injunctive relief "instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources" would affront the sovereignty of a state. Id. at 1361. Ordinarily, this type of concern will be generated only when courts are asked to judge the legality or propriety of public acts committed within a foreign state's own borders. See Sabbatino, 376 U.S. 398, 400-01, 84 S.Ct. 923, 926-27 (act of state involved the Cuban government's act of expropriating the property of aliens located within Cuba); see also Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 (2d Cir.1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966) ("when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States.' " (quoting Restatement (Second) of Foreign Relations Law of the United States § 46 (1962)). In this case, however, we are asked to judge the legality and propriety of an act that occurred within the borders of the United States. Such an inquiry would hardly affront the sovereignty of a foreign nation.
 
 
 85
 Another factor to be considered is the degree of international consensus regarding an activity. In Sabbatino, the Supreme Court stated:
 
 
 86
 It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of facts rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.
 
 
 87
 Sabbatino, 376 U.S. at 428, 84 S.Ct. at 940; see also OPEC, 649 F.2d at 1361 (the lack of international consensus on the propriety of cartels and production agreements weighed in favor of invoking the act of state doctrine to abstain in an antitrust suit challenging the price and production quotas of OPEC); Filartiga v. Pena-Irala, 577 F.Supp. 860, 862 (E.D.N.Y.1984) (act of state doctrine did not bar court from hearing a wrongful death suit based on a police captain's alleged torture and murder of a person in Paraguay because there was general international consensus condemning the use of torture). There is also international consensus condemning murder. See Organization of American States Convention on Terrorism, October 8, 1976, art. 1, 27 U.S.T. 3949, 3957-58, T.I.A.S. No. 8413, ("The contracting states undertake to ... prevent and punish acts of terrorism, especially kidnapping, murder, and other assaults"); Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Dec. 28, 1973, art. 2, 28 U.S.T.1975, 1978, T.I.A.S. No. 8532, 1035 U.N.T.S. 167 (article 2 establishes as a crime "[t]he intentional commission of: (a) a murder, kidnapping or other attack upon the person or liberty of an internationally protected person").
 
 
 88
 Last, this is not the sort of case that is likely to hinder the Executive Branch in its formulation of foreign policy, or result in differing pronouncements on the same subject. See OPEC, 649 F.2d at 1358 ("[T]he United States must speak with one voice...."). Rather, this court would more likely embarrass the Executive Branch if we summarily invoked the act of state doctrine to bar an American citizen from litigating a wrongful death suit for a murder that occurred in the United States. "The decision to deny access to judicial relief is not one we make lightly." OPEC, 649 F.2d at 1360. We conclude that none of the factors present in OPEC that warranted the invocation of the act of state doctrine is present in this type of case.
 
 
 89
 The ROC argues, however, that the judicial proceedings in Taiwan are acts of state. Both parties agree that judgments of a court can be acts of state.
 
 
 90
 A judgment of a court may be an act of state. Usually it is not, because it involves the interests of private litigants or because court adjudication is not the usual way in which the state exercises its jurisdiction to give effect to its public interests.
 
 
 91
 See Restatement (Second) of Foreign Relations Law of the United States § 41 comment d (1965)[2]; see also Timberlane, 549 F.2d at 607-08 (act of state doctrine did not bar suit challenging Honduran judicial decree because "the allegedly 'sovereign' acts of Honduras consisted of judicial proceedings which were initiated by ... a private party ... not by the Honduran government itself" nor does "[the plaintiff] seek to name Honduras or any Honduran officer as a defendant or co-conspirator"). We need not decide whether the ROC courts' decisions were acts of state because we do not challenge those decisions.[3]
 
 
 92
 To the credit of the ROC, rather than attempting to hide the sordid circumstances involved in Liu's assassination, it made an investigation and publicly brought to trial individuals involved, even including one in such a high position as Wong. Our decision merely applies California law to the facts as ascertained by the ROC courts. While the result may involve the financial responsibility of the ROC, it does not affront its sovereignty and can cause no more embarrassment than the exposures already made by the ROC courts. Because of our respondeat superior decision we need not decide whether or to what extent further inquiries might be made of ROC officials. Under these circumstances the act of state doctrine is not a bar to Liu's suit.
 
 CONCLUSION
 
 93
 We hold that the act of state doctrine does not automatically bar a suit against a foreign nation when it is alleged that the nation ordered the assassination of an American citizen within the United States. We reverse the district court's decision dismissing the ROC as a party defendant. We hold that the ROC can be liable for Henry Liu's death under California's law of respondeat superior and the case is remanded for such further proceedings as may be necessary.
 
 
 94
 REVERSED and REMANDED.
 
 
 
 [1]
 The district court, in its order granting the ROC's motion to dismiss, stated that Henry Liu was killed by Chen Chi-li and Wu. Chen Chi-li, however, did not actually shoot Henry Liu, rather he recruited Wu and Tung. The ROC tribunals found that Chen Chi-li waited at a nearby gas station and did not participate in the actual shooting
 
 
 [2]
 The Restatement gives the following example of a judicial decree that would qualify as an act of state:
 
 
 [6]
 State A obtains by eminent domain proceedings title to an electric utility system in its territory. The vesting of title is an act of state within the meaning of the rule stated in this Section
 See Restatement (Second) of Foreign Relations Law of the United States § 41 at 128.
 
 
 [3]
 A recent law review note discusses this issue. See Note, When Nations Kill: The Liu Case and the Act of State Doctrine in Wrongful Death Suits, 12 Hastings Int'l & Comp.L.Rev. 465, 483-84 (1989). Because the parties have not had the opportunity to address the arguments presented in the Note, we do not rely upon it