JOHN DOE I, et al., Plaintiffs,

v.

UNOCAL CORP., et al., Defendants.

No. CV 96–6959 RAP (BQRx).

United States District Court, C.D. California.

March 25, 1997.

Clarifying Order April 24, 1997.

---

junta that seized control in Burma in 1988, and MOGE is a state-owned company controlled by SLORC that produces and sells energy products. Plaintiffs seek injunctive, declaratory and compensatory relief for alleged international human rights violations perpetrated by defendants in furtherance of defendants Unocal, Total and MOGE's joint venture, the Yadana gas pipeline project.

Plaintiffs contend defendants are building offshore drilling stations to extract natural gas from the Andaman Sea and a port and pipeline to transport the gas through the Tenasserim region of Burma and into Thailand. Plaintiffs allege that defendants, through the SLORC military, intelligence and/or police forces, have used and continue to use violence and intimidation to relocate whole villages, enslave farmers living in the area of the proposed pipeline, and steal farmers' property for the benefit of the pipeline. Plaintiffs allege defendants' conduct has caused plaintiffs to suffer death of family members, assault, rape and other torture, forced labor, and the loss of their homes and property, in violation of state law, federal law and customary international law. Plaintiffs seek to represent a class numbering in the tens of thousands and consisting of

all residents of the Tenasserim region of Burma (bounded on the north by the town of Ye; on the south by the town of Tavoy; on the west by the coastline and offshore islands; and on the east by the Thai/Burmese border) who have been, are, or will be forced to relocate their place of residence, and/or contribute labor and/or property and/or [be] subject[ed] to the death of family members, assault, rape or other torture, and other human rights violations in furtherance of the Yadana gas pipeline project in which defendants are joint venturers.

Complaint, § 24.

Plaintiffs seek damages for (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) forced labor; (3) crimes against humanity; (4) torture; (5) violence against women; (6) arbitrary arrest and detention; (7) cruel, inhuman, or degrading treatment; (8) wrongful death; (9) battery; (10) false imprisonment; (11) assault;

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT UNOCAL'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN A PARTY UNDER RULE 19, AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

PAEZ, District Judge.

## I.

### Introduction

Doe plaintiffs, farmers from the Tenasserim region of Burma, bring this class action against defendants Unocal Corp. ("Unocal"), Total S.A. ("Total"), the Myanma Oil and Gas Enterprise ("MOGE"), the State Law and Order Restoration Council ("SLORC"), and individuals John Imle, President of Unocal, and Roger C. Beach Chairman and Chief Executive Officer of Unocal. According to plaintiffs' complaint, SLORC is a military

(12) intentional infliction of emotional distress; (13) negligent infliction of emotional distress; (14) negligence per se; (15) conversion; (16) negligent hiring; (17) negligent supervision; (18) violation of California Business & Professions Code § 17200. In their nineteenth claim, plaintiffs seek injunctive and declaratory relief.

Pending before the Court is defendant Unocal's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Failure to Join a Party under Rule 19, and Failure to State a Claim upon which Relief Can Be Granted ("Motion"). Upon consideration of the parties' moving, opposition and reply papers and the oral arguments of counsel, the Court concludes that:

(1) SLORC and MOGE are entitled to sovereign immunity pursuant to the Foreign Sovereign Immunities Act ("FSIA");

(2) SLORC and MOGE are not indispensable parties under Rule 19 because complete relief may be accorded among the remaining parties in their absence;

(3) subject-matter jurisdiction over plaintiffs' claims against the remaining defendants is available under the Alien Tort Claims Act ("ATCA") and 28 U.S.C. § 1367;

(4) the Court need not reach the jurisdictional questions presented with respect to the Torture Victim Protection Act ("TVPA") and RICO;

(5) prudential concerns embodied in the Act of State doctrine do not preclude consideration of plaintiffs' claims.

(6) plaintiffs have pled sufficient facts to survive Unocal's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6);

(7) plaintiffs claims are not barred by applicable statutes of limitation because factual question exist concerning whether the applicable limitations periods were tolled. Accordingly, the Court need not reach the question of continuing violation at this time and need not determine whether the ten-year period applicable to the TVPA applies to the ATCA. Nonetheless, the Court grants plaintiffs leave to amend to allege additional facts concerning tolling in order to narrow the scope of argument at the summary judgment stage;

(8) plaintiffs are granted leave to amend their eighteenth claim for relief under California Business and Professions Code § 17200; and

(9) plaintiffs shall not amend their complaint in any other respect without leave of Court.

## II.

### *Factual Allegations* [1]

Plaintiffs allege that in the face of massive, nonviolent, pro-democracy demonstrations throughout Burma, the ruling military elite in Burma created the State Law and Order Restoration Council ("SLORC"). SLORC imposed martial law on Burma and renamed it "Myanmar" on September 18, 1988. On May 27, 1990, SLORC held multi-party elections in which the opposition party, the National League for Democracy ("NLD"), founded by Tin Oo and 1991 Nobel Peace Laureate Aung San Suu Kui, captured 82% of the parliamentary seats. SLORC promptly arrested NLD leaders and intensified its campaign of repression against the pro-democracy movement throughout the country. SLORC has been widely condemned for its 1988 crackdown and for its subsequent practices. According to plaintiffs, "[t]here is no functioning judiciary in Burma and any suit against defendants would have been and would still be futile and would result in serious reprisals. There is a pervasive atmosphere of terror and repression throughout the country." Complaint, ¶ 36.

Plaintiffs contend that in or before 1991, several international oil companies, including Unocal and Total, began negotiating with SLORC regarding oil and gas exploration in Burma. As a result of these negotiations,

---

**1.** The factual allegations outlined below are taken from plaintiffs' complaint unless otherwise indicated.

the Yadana gas pipeline project was established to obtain natural gas and oil from the Andaman Sea and transport it, via a pipeline, across the Tenasserim region of Burma. In July of 1992, Total and MOGE signed a production-sharing contract for a joint venture gas drilling project in the Yadana natural gas field. In early 1993, Unocal formally agreed to participate in the joint venture drilling project.

Plaintiffs allege on information and belief that the parties agreed that SLORC, acting as an agent for the joint venture, would clear forest, level ground, and provide labor, materials and security for the Yadana pipeline project. Plaintiffs also contend, on information and belief, that Unocal and Total subsidized SLORC activities in the region, and that numerous acts in furtherance of the joint venture were and continue to be taken in California, including (1) provision of funds and other resources to the project; (2) decision-making regarding assignment of personnel and technology to the project; (3) monitoring, determining and auditing the activities of the project, and (4) decision-making regarding labor relations on the project.

According to plaintiffs, when Unocal and Total entered into the agreement by which SLORC undertook to clear the pipeline route and provide security for the pipeline, defendants knew or should have known that SLORC had a history of human rights abuses violative of customary international law, including the use of forced relocation and forced labor. Nonetheless, plaintiffs claim Unocal and Total provided money to SLORC to pay costs incurred by SLORC for its work on the Yadana gas pipeline project, and paid some, but not all, of the persons forced to work on the project. Those paid allegedly included persons forced to act as porters to military personnel. Plaintiffs assert, on information and belief, that defendants Unocal and Total were aware of and benefitted from, and continue to be aware of and benefit from, the use of forced labor to support the Yadana gas pipeline project.

2. Plaintiffs, complaint also includes the detailed allegations of the proposed representative Doe

In the course of its actions on behalf of the joint venture, plaintiffs allege SLORC carried out a program of violence and intimidation against area villagers. SLORC soldiers forced farmers to relocate their villages, confiscated property and forced inhabitants to clear forest, level the pipeline route, build headquarters for pipeline employees, prepare military outposts and carry supplies and equipment. As a result of the forced relocation, many villagers lost their homes and were deprived of the use of their crops and livestock. As a result of the prevalence of SLORC's forced labor practices, many farmers, including several plaintiffs, were unable to maintain their own homes and farms and were forced to flee. On information and belief, plaintiffs allege women and girls in the Tenasserim region have been targets of rape and other sexual abuse by SLORC officials, both when left behind after male family members have been taken away to perform forced labor and when they themselves have been subjected to forced labor. According to plaintiffs, there are also reports of rape and gang-rape by SLORC officials guarding women during periods of forced labor.

Plaintiffs allege the defendant corporations knew that SLORC committed human rights abuses, including forced labor and forced relocation, in connection with the Yadana gas pipeline project.[2]

### III.

### *Discussion*

Unocal moves to dismiss plaintiffs' complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The motion is a facial attack on jurisdiction and the Court did not conduct an evidentiary hearing. Accordingly, the Court takes the allegations of the complaint as true for purposes of the jurisdictional challenge.

### A. Foreign Sovereign Immunities Act

Unocal contends that this Court lacks subject matter jurisdiction over plaintiffs' claims

plaintiffs.

against SLORC and MOGE. "The Foreign Sovereign Immunities Act provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993) (internal quotation marks omitted) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989)).[3] Under the FSIA, a foreign state is immune from suit, and federal courts lack subject matter jurisdiction over claims against the foreign state, unless one of the enumerated exceptions applies. *Id.; Randolph v. Budget Rent–A–Car,* 97 F.3d 319, 323 (9th Cir.1996) ("Federal jurisdiction does not attach until it is determined that the foreign sovereign lacks immunity under the provisions of the FSIA."). Consequently, whenever an action is brought in district court against a foreign state, "the court must satisfy itself that one of the FSIA exceptions applies ... even if the foreign state does not enter an appearance to assert an immunity defense." *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 706 (9th Cir.1992).

The defendant asserting immunity "bears the burden of establishing its immunity, including the burden of proof that no exception applies." *Phaneuf v. Republic of Indonesia,* 106 F.3d 302, 306 (9th Cir.1997); *see also Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1171 (D.C.Cir.1994) ("It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the exceptions is applicable."). Initially, the defendant must present a prima facie case that it is a sovereign state. *Phaneuf,* 106 F.3d at 305. Once the defendant establishes a prima facie case, "the burden of production shifts to the plaintiff to offer evidence that an exception applies." *Id.* If the plaintiffs' allegations bring the claim within a FSIA exception, the burden then shifts to the party claiming immunity to prove by a preponderance of the evidence that the exception does not apply. *Siderman de Blake,*

965 F.2d at 707–08. If the substantive requirements of the FSIA are met, "a foreign plaintiff [may] sue a foreign sovereign in the courts of the United States." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 619, 112 S.Ct. 2160, 2168–69, 119 L.Ed.2d 394 (1992).

Here, plaintiffs do not dispute that SLORC and MOGE are foreign sovereigns. Accordingly, defendants have established a prima facie case under the FSIA and SLORC and MOGE are presumptively entitled to sovereign immunity. Although the burden of proof remains with Unocal, plaintiffs bear the initial burden of producing evidence that an exception applies. *Phaneuf,* 106 F.3d at 307; *Randolph,* 97 F.3d at 323. Plaintiffs request an opportunity to engage in jurisdictional discovery; however, as the following discussion demonstrates, plaintiffs' allegations regarding SLORC and MOGE's human rights violations perpetrated in connection with the Yadana gas pipeline project are insufficient to invoke the commercial activity exception. Consequently, there is no need for jurisdictional discovery to resolve Unocal's motion to dismiss plaintiffs' claims against SLORC and MOGE.

Plaintiffs contend that the FSIA's commercial activity exception exposes SLORC and MOGE to suit in the United States courts. "Under international law, states are not immune from jurisdiction of foreign courts insofar as their commercial activities are concerned[.]" 28 U.S.C. § 1602. The FSIA provides a general exception to jurisdictional immunity where

the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

3. The FSIA itself provides that "[t]he district courts shall have original jurisdiction [ ] over any nonjury civil action against a foreign state [ ] as to any claim for relief in personam with respect to which the foreign state is not entitled to im-

munity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330. A foreign state includes an agent or instrumentality of a foreign state. 28 U.S.C. § 1603.

28 U.S.C. § 1605(a)(2). Plaintiffs contend that SLORC and MOGE are not entitled to immunity because this case falls within clauses two and three of the commercial activity exception.

■ Clause two applies only to claims that are based upon acts performed in the United States. "A plaintiff's claim is 'based upon' those activities that are elements of the claim that would entitle the plaintiff to relief." *Holden v. Canadian Consulate,* 92 F.3d 918, 920 (9th Cir.1996), *cert. denied, Canadian Consulate v. Holden,* —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). Here, plaintiffs' human rights claims are based upon acts of SLORC and MOGE allegedly committed in Burma, not upon acts allegedly performed in the United States. While the commercial negotiations and decision-making that allegedly occurred in the United States may suffice to establish that defendants were joint actors, they are not "elements" of plaintiffs' claims against the foreign state defendants. Thus, clause two does not apply to plaintiffs' claims against SLORC and MOGE.

Although plaintiffs' claims initially appear to fall within the statutory language of clause three of the exception because they are based on acts outside the United States (human rights violations allegedly committed by SLORC and MOGE) in connection with commercial activity of the foreign state outside the United States (the installation of the Yadana pipeline), controlling authority precludes such an interpretation.

> The FSIA defines "commercial activity" as either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). The Supreme Court has elaborated upon the meaning of "commercial activity," relying on the meaning "generally attached to that term under the 'restrictive' theory [of foreign sovereign im-

munity] at the time the statute was enacted." *Weltover,* 504 U.S. at 612, 112 S.Ct. at 2165. Thus, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614, 112 S.Ct. at 2166. Instead of asking whether the foreign state is seeking to profit from its activities, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* In essence, "a state engages in commercial activity under the restrictive theory where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Nelson,* 507 U.S. at 360, 113 S.Ct. at 1479 (citations and internal quotation marks omitted).

In *Nelson,* the Supreme Court concluded that Saudi Arabia's wrongful arrest, imprisonment and torture of a United States citizen working at a Saudi hospital could not—be considered commercial in nature for purposes of clause one of the commercial activity exception. *Id.* at 361, 113 S.Ct. at 1480. The *Nelson* court held that such conduct

> boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature.... Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.

*Id.* at 361–62, 113 S.Ct. at 1481.[4]

■ Here, SLORC and MOGE engaged in commerce in the same manner as a private citizen might do when they allegedly entered into the Yadana gas pipeline project. In addition, they engaged in the acts upon which the claims are based "in connection

---

4. In support of its holding that an abuse of police power is "peculiarly sovereign in nature," the court relied upon an argument articulated by K. Randall in *Federal Courts and the International*

*Human Rights Paradigm,* 93 (1990), that the commercial activity exception to the FSIA is irrelevant in cases alleging that a foreign state has violated human rights. *Id.*

with" that commercial activity.[5] Nonetheless, SLORC and MOGE's alleged violations of plaintiffs' human rights, allegedly committed in connection with the Yadana gas pipeline project, do not fall within the ambit of the commercial activity exception to the FSIA, as it has been interpreted by the Supreme Court and the Ninth Circuit. Plaintiffs claim that defendants, through the SLORC military, intelligence and/or police forces, have used and continue to use violence and intimidation to relocate whole villages, enslave farmers living in the area of the proposed pipeline, and steal farmers' property for the benefit of the pipeline. Because plaintiffs essentially allege that SLORC and MOGE abused their police power, the foreign sovereign defendants' acts that form the basis of plaintiffs' claims are "peculiarly sovereign in nature" and do not come within the commercial activity exception to the FSIA.

In an abundance of caution, the Court notes that in *Siderman de Blake,* the Ninth Circuit concluded that claims against Argentina that were based upon expropriation of property, including a hotel and real estate holdings, satisfied the requirements of clause three because they were performed in connection with the commercial activities of operating the hotel and managing the expropriated real estate investments in Argentina and had a direct effect in the United States. *Id.,* 965 F.2d at 710. However, the Supreme Court's decision in *Nelson* appears to undermine this aspect of the analysis in *Siderman de Blake.* Admittedly, the *Nelson* court considered the language of the FSIA and concluded that "Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity and one 'based upon' acts performed 'in connection with' such activity." *Nelson,* 507 U.S. at 358, 113 S.Ct. at 1478. Nonetheless, the court stated in dicta that even a successful argument that the Saudi Government "often uses detention and torture to resolve commercial disputes . . . [would] not alter the fact that the powers

allegedly abused were those of police and penal officers." *Id.* at 362, 113 S.Ct. at 1480; *see also In re Estate of Ferdinand Marcos Human Rights Litigation,* 94 F.3d 539, 546 (9th Cir.1996) (exercise of police power to recover property allegedly stolen from treasury is governmental, and commercial activity exception does not apply).

■ Moreover, even if the decision in *Nelson* does not undermine the brief analysis of clause three in *Siderman de Blake,* plaintiffs cannot demonstrate that SLORC and MOGE's alleged acts of torture and expropriation have a direct effect in the United States within the meaning of the FSIA. "An effect is 'direct' for purposes of the commercial activity exception if it follows as an 'immediate consequence' of the defendant's activity." *Adler v. Federal Republic of Nigeria,* 107 F.3d 720, 726 (quoting *Weltover,* 504 U.S. at 618, 112 S.Ct. at 2168). Plaintiffs contend that (1) the use of forced labor and forced relocation, allegedly obtained by recourse to battery, rape, killing and other forms of torture, (2) reduced the cost of the Yadana pipeline project and decreased defendants' labor and operational costs, which (3) provided defendants with an unfair competitive advantage in the United States gas market. However,

> mere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a 'direct effect.' [ ] Rather, courts often look to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located.

*Id.* at 724. The legally significant acts giving rise to plaintiffs' claims occurred in Burma, not in the United States. Accordingly, plaintiffs cannot satisfy the direct effects requirement of the commercial activity exception, and SLORC and MOGE are entitled to sovereign immunity from plaintiffs' suit.

---

**5.** "To satisfy the 'in connection with' requirement, the acts complained of must have some 'substantive connection' or a 'causal link' to the commercial activity." *Adler,* 107 F.3d at 725–27. Here, the alleged acts of torture and expropria-

tion of property committed in furtherance of the Yadana pipeline project are substantively connected to the commercial activity. Accordingly, the "in connection with" requirement of clause three is satisfied.

## B. Indispensable Parties

To determine whether an action should be dismissed under Rule 19 of the Federal Rules of Civil Procedure, courts engage in a two-step inquiry. *Kescoli v. Babbitt,* 101 F.3d 1304, 1308 (9th Cir.1996). First, the court must determine whether the absent party is necessary and cannot be joined. Fed.R.Civ.P. 19(a) provides that a person is a necessary party if

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action[.]

If the court concludes that a party is necessary but cannot be joined, the court must then determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed[.]" Fed.R.Civ.P. 19(b). In so doing, courts are generally directed to balance the following factors:

> (1) prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum.

*Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1460 (9th Cir.1994). However, where the necessary party is immune from suit, balancing may not be necessary because immunity itself may be a compelling factor. *Id.*

■ Because SLORC and MOGE are entitled to sovereign immunity, the Court must determine whether SLORC and MOGE are necessary and indispensable parties. Unocal argues that complete relief cannot be accorded among the remaining parties if SLORC and MOGE are dismissed. However, Unocal bases this argument on its inexplicable contention that plaintiffs allege only vicarious and not joint tortfeasor liability. *See* Complaint, ¶¶ 18 (joint venture), and 20 (conspiracy). Assuming that plaintiffs are able to prove that the defendants are joint tortfeasors, there is no reason complete compensatory relief may not be accorded among the remaining parties. *See Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1552 (N.D.Cal.1987) ("A joint tortfeasor is not a 'necessary' party within the meaning of Rule 19.") (citing Advisory Committee Notes to Fed.R.Civ.P. 19).

In addition, were plaintiffs to prevail, SLORC and MOGE's absence would not impede them from obtaining the core injunctive and declaratory relief they seek. Unocal attempts to analogize this case to *Aquinda v. Texaco, Inc.,* 945 F.Supp. 625 (S.D.N.Y.1996) in which the court concluded that Ecuador and its state-owned oil company were indispensable parties. However, in that case, the court based its decision on the nature of the "extensive equitable relief sought by the plaintiffs—ranging from total environmental 'clean-up' of the affected lands in Ecuador to a major alteration of the consortium's Trans–Ecuador pipeline to the direct monitoring of the affected lands for years to come[.]" *Id.* at 627. Moreover, in *Aquinda,* Ecuador's state-owned oil company owned 100% of the pipeline and 100% of the consortium. *Id.* By contrast, plaintiffs here request "an order directing defendants to cease payment to SLORC, and an order directing defendants to cease their participation in the joint enterprise until the resulting human rights violations in the Tenasserim region cease."

■ In these circumstances, even though plaintiffs will be limited to obtaining injunctive and declaratory relief from defendants other than SLORC and MOGE, if plaintiffs prevail, they may still obtain complete relief from the remaining defendants. Similarly, injunctive relief against the remaining defendants will not burden them any more than such relief would burden them if SLORC and MOGE were subject to suit. Thus, SLORC and MOGE are not necessary parties, and the Court need not consider whether they are indispensable parties.[6]

## C. Alien Tort Claims Act

Jurisdiction against the remaining defendants may be premised on the Alien Tort Claims Act ("ATCA") which provides that

---

6. Unocal's primary argument with respect to the second prong is that it will be prejudiced as a result of its inability to conduct discovery of SLORC and MOGE if the Court lacks subpoena power. There is no evidence that the absence of this Court's subpoena power over SLORC and MOGE will have any appreciable effect on Unocal's ability to conduct discovery.

[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. Thus, the ATCA requires (1) a claim by an alien, (2) alleging a tort, and (3) a violation of international law. Here, plaintiffs are aliens, and they assert tort claims. However, the parties dispute whether plaintiffs may assert claims based on violations of international law against the private defendants.

### 1. Violation of International Law

▮▮▮ First, "[i]t is [ ] well settled that the law of nations is part of federal common law." *In re Estate of Ferdinand E. Marcos Human Rights Litigation,* 978 F.2d 493, 502 (9th Cir.1992) ("Estate I"). "[S]ection 1350 does not require that the action 'arise under' the laws of the United States, but only mandates 'a violation of the law of nations' in order to create a cause of action." *In re Estate of Ferdinand E. Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir.1994) ("Estate II"). The norms of the law of nations are found by consulting juridical writings on public law, considering the general practice of nations, and referring to judicial decisions recognizing and enforcing international law. *See Kadic,* 70 F.3d at 238. Thus, a court applying the ATCA must determine "whether there is an applicable norm of international law, whether it is recognized by the United States, what its status is, and whether it has been violated." *Estate I,* 978 F.2d at 502. Under the ATCA, jurisdiction may be based on a violation "of a jus cogens norm which enjoys the highest status within international law." *Id.* at 500; *see also Estate II,* 25 F.3d at 1475.[7] The prohibition against official torture rises to the level of a jus cogens norm, and jurisdiction may be premised on a violation of that norm. *Id.*

### 2. State Action

▮▮▮ To the extent a state action requirement is incorporated into the ATCA, courts look to the standards developed under 42 U.S.C. § 1983. *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995) "A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Id.* (concluding plaintiffs entitled to prove their allegations that private actor acted under color of law by acting in concert with Yugoslav officials or with significant Yugoslav aid).[8]

Both the Ninth Circuit and the Supreme Court have recognized that "cases deciding when private action might be deemed that of the state have not been a model of consistency." *George v. Pacific–CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996) (citing *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 377–78, 115 S.Ct. 961, 964, 130 L.Ed.2d 902 (1995)), *cert. denied,* —— U.S. ——, 117 S.Ct. 746, 136 L.Ed.2d 684 (1997). Nonetheless, "[t]he Supreme Court has articulated four distinct approaches to the state action question: public function, state compulsion, nexus, and joint action." *Id.* Whether the concerns are treated as separate tests or as factors for consideration, courts must necessarily make a fact-bound inquiry. *Id.*

Under the joint action approach, private actors can be state actors if they are 'willful participant[s] in joint action with the state or its agents.' *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185[ ] (1980). An agreement between government and a private party can create joint action. See, e.g., *Fonda v. Gray,* 707

---

7. As defined in the Vienna Convention on the Law of Treaties, a jus cogens norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'
*Siderman de Blake,* 965 F.2d at 714. "While jus cogens and customary international law are re-

lated, they differ in one important respect. Customary international law, like international law defined by treaties and other international agreements, rests on the consent of states." *Id.*

8. To constitute a state under international law, an entity need only have a defined territory and a permanent population under the control of its own government, with the capacity to engage in formal relations with other states. *Kadic v. Karadzic* 70 F.3d 232, 245 (2d Cir.1995).

F.2d 435, 437 (9th Cir.1983) ("A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights.").

*Id.* at 1231; *see also, Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45 (1961) (where state "insinuates" itself into position of interdependence with private party, it is joint participant in challenged activity); *Carmichael v. United Technologies Corp.,* 835 F.2d 109, 113–14 (5th Cir.1988) (assuming, without deciding, that ATCA confers jurisdiction over private parties who conspire in, or aid and abet, official acts of torture by one nation against the citizens of another nation); *Dennis,* 449 U.S. at 27, 101 S.Ct. at 186 ("Private persons, jointly engaged with state officials in the challenged action, are acting [ ] 'under color' of law for purposes of § 1983 actions.").[9]

In *Dennis,* the Supreme Court concluded that private actors who successfully conspired to bribe a judge were liable as state actors under § 1983 despite judicial immunity. *Id.* Under the joint action test, "courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1453 (10th Cir.1995) (citing *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989)). Thus, where there is a "substantial degree of cooperative action" between the state and private actors in effecting the deprivation of rights, state action is present. *Id.* However, some courts have found that the joint action test requires that the state and private actors "share a ·common, unconstitutional goal." *Id.* (citing *Cunningham v. Southlake Ctr. for Mental Health, Inc.,* 924 F.2d 106, 107 (7th Cir. 1991)).

Here, plaintiffs allege that SLORC and MOGE are agents of the private defendants; that the defendants are joint venturers, working in concert with one another; and that the defendants have conspired to commit the violations of international law alleged in the complaint in order to further the interests of the Yadana gas pipeline project. Additional factual inquiry is not necessary. Plaintiffs have alleged that the private plaintiffs were and are jointly engaged with the state officials in the challenged activity, namely forced labor and other human rights violations in furtherance of the pipeline·project. These allegations are sufficient to support subject-matter jurisdiction under the ATCA.

### 3. Private Liability Absent State Action

Moreover, the private actors may be liable for violations of international law even absent state action. In *Estate I,* the court stated, without significant analysis, that "[o]nly individuals who have acted under official authority or under color of such authority may violate international law . . . ." *Id.* at 501–01 (citing *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 791–95 (Edwards, J., concurring) (rejecting notion that purely private actors have responsibilities under international law)). However, Judge Edwards commented in his concurrence in *Tel–Oren* that individual liability remained available, in the face of the 19th century trend toward· statism, for a handful of private acts, including piracy and slave trading. *Tel–Oren,* 726 F.2d at 794. Judge Edwards concluded that, without guidance from the Supreme Court, he would not include torture among "the handful of crimes to which the law of nations attributes individual responsibility." *Id.* at 795.

Because this action involves allegations of forced labor and because slave trading is included in that "handful of crimes" for which

---

**9.** Defendants reliance on *NCAA v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), is misplaced. There, the court concluded that state action might lie against the University of Nevada, Las Vegas, ("UNLV") if by embracing the NCAA's rules, the University transformed them into state rules and the NCAA into a state actor, but found that there was "no suggestion of impropriety respecting the agreement between the NCAA and UNLV." *Id.* at 197 n. 17, 109 S.Ct. at 465 n. 17. The court contrasted that situation to the one in *Dennis,* where conspirators became state actors when they entered into a corrupt bargain with the judge. *Id.*

the law of nations attributes individual responsibility, this action raises questions not addressed in the Ninth Circuit's decisions in *Estate I* and *Estate II*.[10] However, the recent decision by the Second Circuit in *Kadic* provides a reasoned analysis of the scope of a private individual's liability for violations of international law. There, the court disagreed

> that the law of nations, as understood in the modern era, confines its reach to state action. Instead, [that court held] that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.

70 F.3d at 239. That court ultimately concluded that "[rape,] torture and summary execution—when not perpetrated in the course of genocide or war crimes—are proscribed by international law only when committed by state officials or under color of law." *Id.* at 243. However, like Judge Edwards, the *Kadic* court noted that participation in the slave trade "violates the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." *Id.* at 239.

■ The allegations of forced labor in this case are sufficient to constitute an allegation of participation in slave trading. Although there is no allegation that SLORC is physically selling Burmese citizens to the private defendants, plaintiffs allege that, despite their knowledge of SLORC's practice of forced labor, both in general and with respect to the pipeline project, the private defendants have paid and continue to pay SLORC to provide labor and security for the pipeline, essentially treating SLORC as an

overseer, accepting the benefit of and approving the use of forced labor. These allegations are sufficient to establish subject-matter jurisdiction under the ATCA.[11] Accordingly, the Court has jurisdiction over plaintiffs' supplemental state law claims pursuant to 28 U.S.C. § 1367.

### D. Act of State Doctrine

In addition to the jurisdictional questions discussed above, "two nonjurisdictional, prudential doctrines reflect the judiciary's concerns regarding separation of powers: the political question doctrine and the act of state doctrine." *Kadic*, 70 F.3d at 249. Unocal does not contend that this action presents a political question, but argues that the act of state doctrine applies. In essence, Unocal asserts that by adjudicating plaintiffs, claims, this Court will interfere with the foreign policy efforts of Congress and the President.

The Supreme Court's discussion of the act of state doctrine has shifted over time. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp. International*, 493 U.S. 400, 404, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990). The classic statement of the doctrine rested on notions of international comity,[12] but more recent formulations focus on separation of powers. *Id.*

> The continuing vitality of the doctrine depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of Government on matters bearing upon foreign relations.

*Marcos II*, 862 F.2d at 1360 (internal quotation marks omitted). Thus, the act of state doctrine "reflects the prudential concern that the courts, if they question the validity of

---

**10.** The Ninth Circuit ignored its earlier comment in *Estate I* and merely noted in *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1417 (9th Cir.1995), that it did "not need to reach the issue of whether the law of nations applies to private as opposed to governmental conduct."

**11.** Because the Court has subject-matter jurisdiction under the ATCA, it need not reach the question of whether it has jurisdiction under (1) 28 U.S.C. § 1331 for alleged violations of international law given that federal common law incorporates the law of nations; (2) the Torture Victim Protection Act; or (3) RICO.

**12.** According to the classic statement:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 937–38, 11 L.Ed.2d 804 (1964) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897)).

sovereign acts taken by foreign states, may be interfering with the conduct of American foreign policy by the Executive and Congress." *Siderman de Blake,* 965 F.2d at 717. The party asserting the applicability of the doctrine bears the burden of proof. *Liu v. Republic of China,* 892 F.2d 1419, 1432 (9th Cir.1989).

> Taken as a whole, the act of state doctrine expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Banco Nacional,* 376 U.S. at 423, 84 S.Ct. at 938. The doctrine is limited to situations in which "the relief sought or the defense interposed [ ] require[ ] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Kirkpatrick,* 493 U.S. at 405, 110 S.Ct. at 704.

> Courts in the United States have the power, and ordinarily the obligation, to decide the cases and controversies properly presented to them. The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid.

*Id.*[13] Moreover, "sometimes, even though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." *Id.* at 409, 110 S.Ct. at 706.

In the context of alleged violations of international human rights, the scope of the act of state doctrine is not entirely clear. Plaintiffs cite a string of international human rights cases in which the act of state doctrine was found not to apply. However, defendants correctly note that those cases involved for-

eign officials rather than an entire government.

 The Ninth Circuit has noted in dicta that

> [t]he classification [act of state] might, it may be supposed, be used to prevent judicial challenge in our courts to many deeds of a dictator in power, at least when it is apparent that sustaining such challenge would bring our country into hostile confrontation with the dictator.

*Marcos II,* 862 F.2d at 1360. Extrapolating from that decision, it appears that invocation of the act of state doctrine is not appropriate unless it is "apparent" that adjudication of the matter will bring the nation into hostile confrontation with the foreign state. Where, as here, the coordinate branches of government have already denounced the foreign state's human rights abuses, it is hard to imagine how judicial consideration of the matter will so substantially exacerbate relations as to cause "hostile confrontation."

In addition, courts should consider "whether the foreign state was acting in the public interest." *Liu,* 892 F.2d at 1432. Where a state acts in the public interest, for example, by expropriating the land of its nationals, the *Liu* court concluded that "any injunctive relief, 'instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources' would affront the sovereignty of a state." *Id.* Here, it would be difficult to contend that SLORC and MOGE's alleged violations of international human rights were "in the public interest," I despite the fact that they are directly connected to decisions regarding allocation and profit from Burma's natural resources. In any event, because SLORC and MOGE are entitled to sovereign immunity, plaintiffs may seek injunctive relief against the non-state defendants only. Indeed, the wording of the complaint suggests that they intended to seek injunctive relief only against the non-state defendants and inartfully draft-

---

**13.** The Ninth Circuit has stated that the courts are precluded "from into the validity of the public acts" of a foreign sovereign. *United States v. Merit,* 962 F.2d 917, 921 (9th Cir.1992) (quoting *Banco Nacional,* 376 U.S. at 401, 84 S.Ct. at 926). However, in so doing, it acknowledged that review of public acts that violate the foreign sovereign's own laws is improper. *Id.*

ed the language of the complaint.[14] Plaintiffs should be granted leave to amend to state their claim for injunctive relief against the non-state defendants only.

■■■■ Moreover, where jurisdiction is available for jus cogens violations, it is less likely that judicial pronouncements on a foreign sovereign's actions will undermine the policies behind the act of state doctrine. In determining whether the doctrine bars judicial review one factor to be considered is "the degree of international consensus regarding an activity." *Liu,* 892 F.2d at 1433. The doctrine should not be applied so as to

> totally emasculate the purpose and effectiveness of the Foreign Sovereign Immunities Act by permitting a foreign state to reimpose the so recently supplanted framework of sovereign immunity, as defined prior to the Act, through the back door, under the guise of the act of state doctrine.

*Liu,* 892 F.2d at 1432 (internal quotation marks omitted).[15] In addition, as the *Kadic* court noted:

> it would be a rare case in which the act of state doctrine precluded suit under section 1350. Banco Nacional was careful to recognize the doctrine in the absence of . . . unambiguous agreement regarding con-

trolling legal principles . . . and applied the doctrine only in a context—expropriation of an alien's property—in which world opinion was sharply divided.

*Kadic,* 70 F.3d at 250 (internal quotation marks omitted) (citing *Banco Nacional,* 376 U.S. at 428–30, 84 S.Ct. at 940–41). In the context of jus cogens violations of international law, which are, by definition, internationally denounced, the high degree of international consensus severely undermines defendants' argument that SLORC and MOGE's alleged activities should be treated as acts of state.[16]

■■■■ As noted above, where the policies underlying the doctrine militate against its application, the act of state doctrine should not apply, even to claims that a foreign government's actions are or were invalid. *Kirkpatrick,* 493 U.S. at 409, 110 S.Ct. at 706–07. Because nations do not, and cannot under international law, claim a right to torture or enslave their own citizens, a finding that a nation has committed such acts, particularly where, as here, that finding comports with the prior conclusions of the coordinate branches of government, should have no detrimental effect on the policies underlying the act of state doctrine.[17] Accordingly, the

**14.** In the prayer for relief, plaintiffs request "an order directing defendants to cease payment to SLORC, and an order directing defendants to cease their participation in the joint enterprise. . . ."

**15.** In an earlier case involving alleged price-fixing by OPEC, the Ninth Circuit concluded that the commercial activity exception to FISA did not dilute the act of state doctrine. *International Assn. of Machinists and Aerospace Workers v. Organization of the Petroleum Exporting Countries,* 649 F.2d 1354, 1360 (9th Cir.1981). However, in that case, the court found that the record revealed "no international consensus condemning cartels, royalties and production agreements." *Id.*

**16.** "That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens." *Siderman de Blake,* 965 F.2d at 717.

**17.** Unocal contends that adjudication of this case will interfere with Congressional and Executive efforts to exert pressure on SLORC to reform its human rights record. Thus, Unocal states that

while vigorously attempting to encourage democratic reform and respect for human rights, Congress and the President have refrained from taking precipitous steps, such as prohibiting all American investment, that might serve only to isolate the Burmese Government [i.e. SLORC] and actually hinder efforts toward reform. This careful approach is reflected in the fact that, after a spirited debate, Congress recently granted the President conditional authority to prohibit only "new investment" in Burma, and even then only if the President certifies that Burma is once again committing certain serious human rights abuses. [] Against this backdrop, this lawsuit represents an unprecedented attempt to enmesh the federal courts in setting American foreign and economic policy toward Burma.

Unocal Memorandum of Points and Authorities in Support of Motion to Dismiss at 1. However, a review of the portions of the Congressional Record cited by Unocal reveals that the debate involved a dispute over whether to promptly impose unilateral sanctions on Burma, as advocated by Senator Helms, or refrain from immediately imposing such sanctions to allow the President to work with other nations to develop

Court need not apply the act of state doctrine in this case.

## G. Failure to State a Claim

### 1. *Standard*

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1990). "It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir.1986), *cert. denied, City of Santa Barbara v. Hall*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), *overruled on other grounds, Yee v. City of Escondido*, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). Therefore, a court must not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir.1981).

"All allegations of material facts are taken as true and construed in the light most favorable to the non-moving party." *Hall*, 833 F.2d at 1274, n. 9. *See also NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986); *Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir.1980). However, the court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

Furthermore, unless the court converts a Rule 12(b)(6) motion into a motion for summary judgment, the court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991), *overruled on other grounds, Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), *superseded by statute on other grounds, U.S. S.E.C. v. Fehn*, 97 F.3d 1276 (1996). The Court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988). In addition, "a document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell*, 14 F.3d 449, 453

a multilateral strategy to improve conditions in Burma, as advocated by Senators Feinstein and McCain. *See* 142 Cong. Rec. § 8741–02, § 8753–8755 (daily ed. July 25, 1996); *see also* Statement by the Press Secretary, White House Office of Communications, 1996 WL 420086 at *1 (July 25, 1996). In fact, Senator Helms stated in support of his position in the debate that "[w]e know there is forced labor in Burma." *Id.* at § 8753.

Even accepting the Congressional and Executive decisions as Unocal frames them, the coordinate branches of government have simply indicated an intention to encourage reform by allowing companies from the United States to assert positive pressure on SLORC through their investments in Burma. *See id.* at § 8755 (statement of Sen. McCain) (contending that an

immediate investment sanction would decrease the United States' leverage with respect to human rights violations in Burma and might increase repression of the pro-democracy activists in Burma).

Plaintiffs essentially contend that Unocal, rather than encouraging reform through investment, is knowingly taking advantage of and profiting from SLORC's practice of using forced labor and forced relocation, in concert with other human rights violations including rape and other torture, to further the interests of the Yadana gas pipeline project. Whatever the Court's final decision in this action may be, it will not reflect on, undermine or limit the policy determinations made by the coordinate branches with respect to human rights violations in Burma.

(9th Cir.1994), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994).

### 2. Application

■ Unocal makes a broad-based argument that plaintiffs fail to state a claim against Unocal because they allege no facts that could conceivably establish Unocal's liability for any of SLORC's actions in Burma. However, plaintiffs' complaint includes a number of allegations that indicate plaintiffs may be able to prove facts in support of their claims. First, plaintiffs allege that Unocal and its officers knew or should have known about SLORC's practices of forced labor and relocation when they agreed to invest in the Yadana gas pipeline project, and that, despite this knowledge, they agreed that SLORC would provide labor for the joint venture and would be responsible for clearing the way for the pipeline and providing security. In addition, plaintiffs assert that Unocal and its officers "were aware of and benefitted from and continue to be aware of and benefit from the use of forced labor to support the Yadana gas pipeline project." Complaint, ¶ 51. Plaintiffs also allege that Unocal knew that SLORC "committed human rights abuses, including forced labor and forced relocation, in connection with the Yadana gas pipeline project." Complaint, ¶ 52. Unocal's contention that the complaint makes only conclusory allegations is meritless.

In support of its argument that the complaint fails to state a claim against Unocal or its officers, Unocal contends that plaintiffs' allegations establish the presence of a business relationship with SLORC and MOGE and nothing more. Were this the case, Unocal would clearly be entitled to dismissal. However, plaintiffs could conceivably prove facts to support their allegations and thereby demonstrate the very connection between Unocal and SLORC that Unocal denies, namely that Unocal and SLORC have either conspired or acted as joint participants to deprive plaintiffs of international human rights in order to further their financial interests in the Yadana gas pipeline project.

Because Unocal does not specifically seek dismissal with respect to plaintiffs' individual claims, the Court does not address each claim.

## H. Statutes of Limitation

Plaintiffs filed their complaint on October 3, 1996. They allege accrual of claims as early as 1991, but the earliest claim specifically alleged accrued on May 12, 1992. Complaint, ¶ 60. The parties agree that plaintiffs' claims under RICO and California Business and Professions Code § 17200 are governed by four-year statutes of limitation. Accordingly, absent equitable tolling or application of the continuing violation doctrine, RICO and § 17200 claims accruing before October 3, 1992, are time-barred. The parties also agree that the TVPA provides a ten-year limitations period. Under the TVPA, torture is defined, in relevant part, as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ... whether physical or mental, is intentionally inflicted on that individual for such purposes as ... intimidating or coercing that individual or a third person....

28 U.S.C. § 1350 note, § 3(b)(1). Although plaintiffs are correct that this definition is broad, the breadth of the TVPA has little to do with the length of the limitations periods applicable to plaintiffs' other claims.

With respect to plaintiffs' numerous state law tort claims, plaintiffs do not actively contest defendants' argument that, absent tolling or the effect of the continuing violation doctrine, California's one-year statute of limitations for personal injury torts applies.

However, the parties do dispute the length of the limitations period for the ATCA. Plaintiffs argue that the TVPA ten-year period provides the closest federal analogy, and that reliance on pre-TVPA analogies to § 1983 and the forum state's personal injury statute of limitations would undermine the need for uniformity and the purpose of the federal cause of action. The Supreme Court recently explained that

> reference to federal law is the exception, and we decline to follow a state limitations period only when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when

federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking.

*North Star Steel Co. v. Thomas,* —— U.S. ——, ——, 115 S.Ct. 1927, 1931, 132 L.Ed.2d 27 (1995) (citations and internal quotation marks omitted).

In *Hilao v. Estate of Ferdinand Marcos,* 103 F.3d 767, 779 (9th Cir.1996), the Ninth Circuit refused to decide whether the TVPA ten-year period applied to all claims under the ATCA because it found the limitations period was equitably tolled. However, two district courts have concluded that the TVPA period does apply to all claims under the ATCA. *See Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189 (S.D.N.Y.1996); *Xuncax v. Gramajo,* 886 F.Supp. 162 (D.Mass.1995). In a pre-TVPA decision, a Northern District of California court applied the one-year state law limitations period, but reasoned that there was no reason to look beyond the state law for a limitations period because the most analogous federal law was § 1983. *Forti,* 672 F.Supp. at 1548. Because the Court concludes that plaintiffs have raised an issue of fact regarding equitable tolling, the Court need not determine whether the TVPA limitations period is applicable to all ATCA claims.

**2. Equitable Tolling**

 Under federal law, equitable tolling is available where (1) defendant's wrongful conduct prevented plaintiff from asserting the claim; or (2) extraordinary circumstances outside the plaintiff's control made it impossible to timely assert the claim. *Forti,* 672 F.Supp. at 1549 (holding that given pervasiveness of military's reign of terror plaintiffs might be able to demonstrate that they were denied access to Argentine courts). Applying this same test, the Ninth Circuit recently concluded that because of extraordinary circumstances outside plaintiffs' control resulting in fear of intimidation and reprisal, claims against Marcos for injury from torture, disappearance, or summary execution were tolled until he left office. *Hilao,* 103 F.3d at 772.

Here, defendants contend that the complaint contains no allegations to support equitable tolling for the claims alleged. Thus, according to defendants plaintiffs have failed to allege extraordinary circumstances outside their control that made it impossible for them to timely assert their claims. *See Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1549 (N.D.Cal.1987).

 Plaintiffs have sufficiently alleged that they could obtain no relief in Burma because there is no functioning judiciary there. However, defendants are correct that plaintiffs have not specifically alleged that they could not have brought their claims in the United States. Nonetheless, based on the Ninth Circuit's recent decision in *Hilao,* plaintiffs claims should be tolled as long as SLORC remains in power and plaintiffs are unable to obtain access to judicial review. *See Hilao,* 103 F.3d at 772. For those plaintiffs who remain in Burma, attempts to access courts in this country may present a threat of reprisal from SLORC.

Plaintiffs' allegations are sufficient to raise an issue of fact as to whether the limitations period was tolled. Accordingly, the Court need not reach the question of continuing violation at this time. Nonetheless, the Court grants plaintiffs leave to amend to allege additional facts relevant to equitable tolling in order to narrow the scope of argument at the summary judgment stage.

**I. Claim under Business & Professions Code § 17200, et seq.**

Defendants moved to dismiss plaintiffs' eighteenth claim for relief under § 17200 on grounds that the named plaintiff, Louisa Benson, has alleged no injury and therefore lacks standing to sue. Plaintiffs seek leave to amend their § 17200 claim. Unocal does not object to dismissal with leave to amend, assuming the Court concludes it has subject-matter jurisdiction over the action. Accordingly, plaintiffs are granted leave to amend their complaint to assert their claims against the non-foreign state defendants only.

**IV.**

**Conclusion**

For the foregoing reasons, Unocal's motion to dismiss plaintiffs' complaint is DENIED

in part and GRANTED in part. Although SLORC and MOGE are entitled to sovereign immunity pursuant to the FSIA, they are not indispensable parties under Rule 19 because complete relief may be accorded among the remaining parties in their absence. Subject-matter jurisdiction over plaintiffs' claims against the remaining defendants is available under the Alien Tort Claims Act ("ATCA") and 28 U.S.C. § 1367. The Court does not reach the jurisdictional questions presented with respect to the Torture Victim Protection Act ("TVPA") and RICO. Moreover, prudential concerns embodied in the Act of State doctrine do not preclude consideration of plaintiffs' claims.

Plaintiffs have pled sufficient facts to survive Unocal's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), and their claims are not barred by the applicable statutes of limitation because factual question exist concerning whether the applicable limitations periods were tolled. Accordingly, the Court does not reach the question of continuing violation at this time and need not determine whether the ten-year period applicable to the TVPA applies to the ATCA. Nonetheless, the Court GRANTS plaintiffs leave to amend within 10 days of entry of this order to allege additional facts concerning tolling in order to narrow the scope of argument at the summary judgment stage. Finally, defendants' motion to dismiss plaintiffs' eighteenth claim for relief under California Business and Professions Code § 17200 is GRANTED and plaintiffs are granted leave to amend that claim within 10 days of entry of this order. Plaintiffs shall not amend their complaint in any other respect without leave of Court.

Plaintiffs' Motion for Class Certification was originally scheduled to be heard on March 3, 1997. The Court vacated that hearing date pending resolution of Unocal's Motion to Dismiss. Plaintiffs' Motion for Class Certification is reset for hearing on April 28, 1997, at 9:30 a.m. Defendants' opposition shall be filed and served on or before April 7,

1997. Plaintiffs' reply shall be filed on or before April 14, 1997.

**IT IS SO ORDERED.**

ORDER CLARIFYING THE COURT'S MARCH 26, 1997, ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT UNOCAL'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN A PARTY UNDER RULE 19, AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

On April 14, 1997, the Court heard oral argument on Unocal's pending motion to dismiss in the related action entitled *National Coalition Government of the Union of Burma, et al. v. Unocal, et al.,* CV 96–6112 RAP (BQRx). That motion raised a number of issues addressed by the Court in its Order Granting in Part and Denying in Part Defendant Unocal's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Failure to Join a Party under Rule 19, and Failure to State a Claim upon which Relief Can Be Granted ("Order"), filed in this action on March 26, 1997. In reviewing the Order in preparation for the hearing on the related case, the Court noted the need to clarify that the act of state doctrine bars plaintiffs' claims insofar as they are based on expropriation of property. Accordingly, the Court now enters this order clarifying the Court's ruling.

As the Court's discussion of the act of state doctrine in the Order explains, in the context of jus cogens violations of international law, which are, by definition, internationally denounced, the high degree of international consensus severely undermines defendants' argument that SLORC and MOGE's alleged activities should be treated as acts of state.[1] Moreover, where the policies underlying the doctrine militate against its application, the act of state doctrine should not apply, even to claims that a foreign government's actions are or were invalid. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp. International,*

---

1. "That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens." *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 717 (9th Cir.1992).

493 U.S. 400, 409, 110 S.Ct. 701, 706–07, 107 L.Ed.2d 816 (1990).

Because nations do not, and cannot under international law, claim a right to torture or enslave their own citizens, a finding that a nation has committed such acts, particularly where, as here, that finding comports with the prior conclusions of the coordinate branches of government, should have no detrimental effect on the policies underlying the act of state doctrine. Accordingly, the act of state doctrine does not preclude this Court from considering claims that are based on legal principles about which the international community has reached unambiguous agreement. *See Kadic,* 70 F.3d at 250.

 By contrast, *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937–38, 11 L.Ed.2d 804 (1964); *Liu v. Republic of China,* 892 F.2d 1419, 1432 (9th Cir.1989); and *Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995) establish that prudential concerns embodied in the doctrine preclude consideration of plaintiffs' claims based on expropriation of property. Accordingly, plaintiffs are **GRANTED** leave to amend the First Amended Complaint, filed on April 4, 1997, within 10 days of entry of this order to delete all claims based on alleged expropriation of property.

**IT IS SO ORDERED.**