**BAO GE, et al., Plaintiffs,**

v.

**LI PENG, et al., Defendants.**

**No. 98CV1986 (TFH).**

United States District Court,
District of Columbia.

Aug. 28, 2000.

Order Denying Reconsideration,
Nov. 15, 2000.

John David Hemenway, Hemenway & Associates, Washington, DC, for plaintiffs.

Mark Fox Evens, Thelen, Reid & Priest, LLP, Washington, DC, for Bank of China, defendant.

Wallace Albert Christensen, I, Ross, Dixon & Bell, LLP, Washington, DC, for Adidas America, Stevens Wynne, defendants.

### MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case is a proposed class action lawsuit against the Chinese Politburo, Politburo Chairman Li Peng, the Bank of China (in New York), and various corporate branches of Adidas. The plaintiffs are four citizens of China who claim to be current or former inmates of the "Shanghai Number 1 Reeducation Through Coerced Labor" prison camps. Defendants Bank of China and Adidas have moved to dismiss this action for lack of subject matter jurisdiction. Based upon the pleadings and the oral argument held on July 20, 2000, defendants' motions will be granted.

## I. BACKGROUND

This action concerns various human rights abuses allegedly perpetrated by the Chinese government. Plaintiffs, who are Chinese citizens, allege that the Chinese government imprisoned them without due process of law and forced them to engage in prison labor, which included the sewing of soccer balls. The first amended complaint names four Chinese citizens as potential class representatives for this suit: Bao Ge and Zhang Xianglang, both now living in the United States; Yang Qinheng, now in "involuntary servitude" in China; John Doe I, a human rights activist in Shanghai, China; and John Doe II, a worker in Fuzhou, Fujian Province, China. Plaintiffs seek to represent a class of between 2,000 and 200,000 other Chinese citizens who have been imprisoned in Chinese labor camps and allegedly forced to make Adidas soccer balls. The time period for the potential class is presumably between December 1995 through June 1997, which is when Bao Ge was detained in the Shanghai camp and allegedly required to make soccer balls. The defendants are the Politburo of the Central Committee of the Communist Party of China in Beijing and Politburo Chairman Li Peng (collectively, "the Chinese government defendants"); the Bank of China ("the Bank"), a commercial Chinese bank owned by the Chinese government; Adidas America, Adidas AG, Adidas New York, "any and all unnamed Adidas subsidiaries," and Steve

Wynn, an agent for Adidas (collectively, "Adidas").

According to the first amended complaint,[1] plaintiffs were incarcerated in "Reeducation Through Coerced Labor" camps by authorities of the Communist Party of China. (First Am.Compl., ¶ 9). Plaintiff Yang Qinheng allegedly was incarcerated for his involvement in China's free labor movement. (First Am.Compl., ¶ 23). The first amended complaint does not state any specific reason for the incarceration of the other plaintiffs, but asserts that all plaintiffs "got there by displeasing and attracting the attention of CCP functionaries" (*Id.*) Although plaintiffs claim they did not receive "due process as we know it in the West," their sentences were imposed by means of an administrative decision issued by "both the public security bureaus and the Labor Reeducation Administration Committee," and implemented under the auspices of China's Labor Reform Administration and the Department of Justice. (First Am.Compl., ¶ 83). The first amended complaint further alleges that the plaintiffs "were compelled by the physical force of their jailers to sew Adidas soccer balls in sweat shops as forced laborers" (First Am.Compl., ¶ 9). While confined in the prison, plaintiffs "were coerced into waxing, stitching, sewing and making 'Adidas' soccer balls 14–18 hours a day under inhumane conditions. [Plaintiffs were subjected to] [b]eatings with belts, tortures of various horrifying kinds, exposure of their bodies to mosquito bites and needle wounds, high voltage electrical prod shocks and other inhumane treatments such as malnutrition, no medical attention and lack of sleep." (First Am.Compl., ¶ 16).

In respect to Adidas, the first amended complaint alleges that a business relationship existed between Adidas and the Chinese government. The first amended complaint refers to this relationship variously as a "joint venture," a "partnership," or as a "licensing arrangement." The only factual allegation connecting Adidas to the forced labor camps is that while incarcerated some of the plaintiffs stitched soccer balls bearing the Adidas logo. (First Am. Compl., ¶ 16). From this fact, plaintiffs conclude that there "must have [been] either joint venture agreements or licensing agreements" between Adidas and the Chinese government (First Am.Compl., ¶ 95); that Adidas knew that soccer balls were being stitched by prison inmates; that Adidas knew or should have known that the prisoners were incarcerated without due process of law; and that Adidas knew or should have known that its alleged conduct would "prolong the life of the system of oppression and terror inflicted intentionally over Mainland China and that ... its actions were the direct and proximate cause of resistance to even moderate changes in Communist China, thus prolonging the life of despotism that is contrary to the laws of nations in the twentieth century." (First Am.Compl., ¶ 123).

In respect to the Bank of China, plaintiffs allege that because China's 1980 Interim Foreign Exchange Regulations recognized the Bank's exclusive role in foreign exchange transactions in China, the Bank necessarily must have been involved in the soccer ball project from 1995 through 1997.[2] (First Am.

---

**1.** Plaintiffs have filed a motion for leave to file a second amended complaint. As set forth *infra,* the jurisdictional defects present in this case are inherent to plaintiffs' cause of action, and are not curable through the additional

amended complaint. Plaintiffs' motion will therefore be denied.

**2.** According to the Declaration of Mr. Gao Zhunlai, submitted by the Bank, fourteen Chinese banks were in fact authorized to handle

Compl., ¶¶ 36–50). Plaintiffs assert that the Bank's involvement in the project had a direct effect in the United States in the form of low-cost soccer balls flowing into the stream of United States commerce. (First Am.Compl., ¶¶ 28, 43–46, 50).

Count I of the first amended complaint is under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"). Count II involves a claim for civil conspiracy to violate ATCA. Count III argues a theory of joint venture liability between Adidas and the Chinese Politburo. Count IV argues that Adidas is liable under a theory of implied partnership liability. Count V asserts a claim for negligence and recklessness. Count VI is a claim for unjust enrichment.

Both Adidas and the Bank of China have moved to dismiss the first amended complaint for, *inter alia*, a lack of subject matter jurisdiction.[3] Those motions have been fully briefed, and are considered below.

## II. DISCUSSION

### A. Standard of Review

 In considering a motion to dismiss for lack of subject matter jurisdiction, the Court accepts as true all material factual allegations in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir. 1986). The nonmoving party is entitled to all reasonable inferences that can be drawn in her favor. *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C.Cir.1998). Additionally, a court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case. *See, e.g., Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.Cir.1987); *Borg–Warner Protective Services Corporation v. EEOC*, 81 F.Supp.2d 20, 23 (D.D.C.2000).

The first amended complaint in this case contains numerous, sweeping allegations concerning the Chinese government, the Bank of China and Adidas. It therefore bears emphasizing that the Court must consider as true only the "well-pleaded facts" set forth in the first amended complaint. *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 165 n. 2 (D.C.Cir.1994).

### B. Adidas' Motion to Dismiss

Plaintiffs seek to establish federal jurisdiction over Adidas pursuant to three provisions: (1) the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350; (2) the Torture Victim Protection Act, 28 U.S.C. § 1350, note; and (3) the supplemental jurisdiction statute, 28 U.S.C. § 1367. Each alleged basis of subject matter jurisdiction is considered below.

#### 1. ATCA

 The ATCA, enacted as part of the Judiciary Act of 1789, provides:

> The district court shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. The ATCA confers federal subject matter jurisdiction when three conditions are satisfied: (1) the plaintiff is

---

foreign exchange transactions in China by 1996. *See* Gao Decl. ¶¶ 30–32, 34 & 37–39.

**3.** On July 13, 1999, this Court granted plaintiffs' motion to conduct limited jurisdictional discovery, and referred this matter to Magistrate Judge Robinson. On May 17, 2000, Magistrate Judge Robinson signed an Order certifying the completion of jurisdictional discovery. Plaintiffs have made no further factual allegations as a result of the jurisdictional discovery.

an alien; (2) the claim is for a tort; and (3) the tort is committed in violation of the law of nations or a treaty of the United States. *See Doe I v. Islamic Salvation Front,* 993 F.Supp. 3, 7 (D.D.C.1998) (citing *Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995)). In this case, only the third prerequisite of ATCA jurisdiction is in dispute.[4] If the well-pleaded factual allegations contained in the complaint are sufficient to support a violation of the law of nations by Adidas, then subject matter jurisdiction is proper.

▪ The law of nations " 'may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.' " *Iwanowa v. Ford Motor Company,* 67 F.Supp.2d 424, 439 (D.N.J.1999) (quoting *United States v. Smith,* 5 Wheat. 153, 18 U.S. 153, 160–61, 5 L.Ed. 57 (1820)); *see also* Oppenheim's International Law, § 1 at 4 (defining the law of nations as "the body of rules which are legally binding on states in their intercourse with each other."). A rule of customary international law exists when there is "a general and consistent practice of states followed by them from a sense of legal obligation." Restatement (Third) of the Foreign Relations Law of the United States § 102; *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 778 n. 2 (D.C.Cir. 1984) ("Congress ... opened courts to aliens to challenge violations of the law of nations, to the extent that the law of nations established a binding obligation.") (Edwards, J., concurring).

▪ Under the caselaw interpreting the ATCA, private entities such as Adidas can be found to have violated the law of nations under two sets of circumstances. First, a private party may be liable for violations of the law of nations where the individual was acting as an officer of the state or under color of state law. *See Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980); *In re Estate of Ferdinand E. Marcos Human Rights Litig.,* 978 F.2d 493, 501 (9th Cir.1992) ("[o]nly individuals who have acted under official authority or under color of such authority may violate international law ...."). Second, several courts have held that a private actor can be found to have violated the law of nations for extreme forms of egregious misconduct. *See, e.g., Kadic,* 70 F.3d at 239 ("certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."). Specifically, section 1350 jurisdiction can be exercised over acts such as piracy and slavery, because "[h]istorically these offenses held a special place in the law of nations: their perpetrators, dubbed enemies of all mankind, were susceptible to prosecution by any nation capturing them." *Tel–Oren,* 726 F.2d at 781 (Edwards, J., concurring).

In this case, the lone factual allegation connecting Adidas to the soccer ball project is that the soccer balls were imprinted with an Adidas logo. *See* First Am. Compl., ¶ 16. Based on this assertion and the fair inferences that can be drawn therefrom, plaintiffs maintain that this Court can exercise subject matter jurisdiction over the claims against Adidas. Plaintiffs do not specify whether Adidas is liable as a *de facto* state actor, a private actor, or both. *See id.* at ¶ 12 (describing Adidas and Chinese government defen-

---

4. Based on oral argument and the pleadings in this case, it is apparent that plaintiffs rely upon the cited treaties as "evidence of an emerging norm of customary law, rather th[a]n independent sources of law[.]" *Filarti-*

*ga v. Pena–Irala,* 630 F.2d 876, 880 n. 7 (2d Cir.1980). Thus, the Court's discussion is limited to alleged violations of the law of nations, except insofar as treaties embody a norm of international law.

dants as "affiliates" or "joint venturers"). The Court will therefore consider both theories of ATCA jurisdiction.

### i) State Actor

█ Two district courts have recently addressed the question of when private corporations can be treated as *de facto* state actors for the purposes of the ATCA. In *Doe v. Unocal Corp.*, 963 F.Supp. 880 (C.D.Cal.1997), the plaintiffs alleged that several oil companies entered into a joint venture with the military government of Burma to build a natural gas pipeline through the Burmese countryside. Pursuant to the terms of the joint venture agreement, the military government agreed to secure and clear the land necessary to build the pipeline, and to provide labor for the project. Plaintiffs were Burmese villagers who alleged that the oil companies directly paid the military government to provide conscripted labor and to act as an "overseer" of the laborers. The court denied Unocal's motion to dismiss the claims under the ATCA, finding that the complaint alleged a violation of the "law of nations" against Unocal, as Unocal's involvement in the joint venture constituted "participation in slave trading." *Id.* at 891–92.

In *Iwanowa v. Ford Motor Company*, 67 F.Supp.2d 424 (D.N.J.1999), the plaintiffs alleged that Ford Werke, a German subsidiary of Ford Motor Company, used slave labor during World War II to meet its production quotas and to increase its profits. The forced laborers at Ford Werke's Cologne, Germany plant included French prisoners of war; Russian, Ukrainian, Italian and Belgian civilians; and concentration camp inmates from Buchenwald. *Id.* at 433. The lead plaintiff, Elsa Iwanowa, was abducted by Nazi soldiers from Rostov, Russia. She was then purchased by Ford Werke and required to perform heavy labor without compensation at Ford Werke's German plant. The *Iwanowa* court found that Ford Werke was a *de facto* state actor during the time it utilized slave labor. *Id.* at 445–46. The court therefore held that subject matter jurisdiction was proper under the ATCA, although it dismissed the case on other grounds.

As in *Unocal* and *Iwanowa*, the issue here is whether a private corporation can be held liable under the ATCA as a *de facto* state actor. Looking to the character and circumstances of the alleged partnerships, it is clear that the instant case is distinguishable from *Unocal* and *Iwanowa*. Both the *Unocal* and the *Iwanowa* plaintiffs alleged a close connection between the private defendants and the state actors. According to the complaint in *Unocal*, the defendant corporations had entered formal agreements in respect to the gas pipeline project. *Unocal*, 963 F.Supp. at 885. Moreover, the corporations had (1) provided funds and other resources to the project; (2) made decisions in respect to the assignment of personnel and technology to the project; (3) monitored, determined and audited the activities of the project; and (4) made decisions regarding labor relations on the project. *Id.*

Similarly, the complaint in *Iwanowa* alleged that the Nazis encouraged German industries (including Ford Werke) to bid for forced laborers in order to meet production quotas and to increase their profits. The complaint further alleged that as a result of the Nazi's solicitation, Ford Werke purchased laborers, including Iwanowa, from the Nazis. *Iwanowa*, 67 F.Supp.2d at 445. Hence, the complaint alleged that defendants "acted in close cooperation with Nazi officials in compelling civilians to perform forced labor." *Id.*

In this case, the only factual allegation tying Adidas to the soccer ball project is

the presence of Adidas logos on the soccer balls that the Chinese inmates were forced to assemble. *See* First Am.Compl., ¶ 16. Despite the fact that this Court permitted plaintiffs the opportunity to engage in jurisdictional discovery, plaintiffs have not identified the existence of any formal agreements in respect to the soccer ball project, and do not allege that Adidas had a direct role in either plaintiffs' incarceration or their treatment while in prison. Thus, it is clear that plaintiffs here have not alleged the "substantial degree of cooperative action" between the Chinese government defendants and Adidas such that jurisdiction would be proper under a state action theory. *See Unocal*, 963 F.Supp. at 891 ("where there is a 'substantial degree of cooperative action' between the state and private actors in effecting the deprivation of rights, state action is present.") (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir.1995)).

### ii) Private Actor[5]

■ The cases recognizing an ATCA cause of action against private individuals or corporations have done so in the context of the most egregious kinds of human rights violations. *See Kadic*, 70 F.3d at 241–244 (genocide, war crimes and summary execution); *Doe I*, 993 F.Supp. at 5 (systematic killing and rape). Based on *Kadic* and Judge Edwards' concurring opinion in *Tel–Oren*, other courts extended the cause of action to slave trading and the systematic use of slave labor. *See Unocal*, 963 F.Supp. at 892; *Iwanowa*, 67 F.Supp.2d at 445.

■ Unlike *Kadic* and its progeny, this case involves the use of forced prison labor in the production of soccer balls. Although forced prison labor under dire conditions may be condemnable in its own right, it is not the equivalent of the acts of genocide at issue in *Kadic*, or the slave labor practices at issue in *Unocal* or *Iwanowa*. Moreover, forced prison labor is not a state practice proscribed by international law. *See* Restatement (Third) of the Foreign Relations Law of the United States (1986) § 702.[6] It therefore cannot be within the "handful of crimes to which the law of nations attributes individual responsibility." *Tel–Oren*, 726 F.2d at 795 (Edwards, J., concurring); *see also* Restatement (Third) at § 404. Thus, plaintiffs' claim for relief under the ATCA must be dismissed.

---

**5.** It should be noted that this Circuit has not squarely addressed the issue of whether ATCA jurisdiction extends to private parties. In Judge Edwards' concurring opinion in *Tel–Oren*, he noted that slave trading, piracy, and a "handful of other private acts" constitute violations of international law by private actors. Since the 1985 *Tel–Oren* decision, however, the Circuit has not had the opportunity to address the question of ATCA and private parties. Based on the guidance in *Tel–Oren* and subsequent opinions of this Court, *see, e.g., Doe I v. Islamic Salvation Front*, 993 F.Supp. 3, 8 (D.D.C.1998), the Court will accept the Second Circuit's conclusion that ATCA jurisdiction extends to private parties for egregious acts of misconduct. *See Kadic*, 70 F.3d at 241–244 (ATCA extends to acts of genocide, war crimes and summary execution regardless of whether individual acted under color of state law).

**6.** Section 702 provides:

A state violates international law if, as a matter of state policy, it practices, encourages, or condones
 (a) genocide,
 (b) slavery or slave trade,
 (c) the murder or causing the disappearance of individuals,
 (d) torture or other cruel, inhuman, or degrading treatment or punishment,
 (e) prolonged arbitrary detention,
 (f) systematic racial discrimination,
 (g) a consistent pattern of gross violations of internationally recognized human rights.

## 2. TVPA

■ The Torture Victim Protection Act creates a cause of action against an individual who, "under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture." 28 U.S.C. § 1350, note. In contrast to the ATCA, the TVPA "contains explicit language requiring state action." *Islamic Salvation Front*, 993 F.Supp. at 9. Because Adidas is not a state actor or a *de facto* state actor, plaintiffs cannot establish a claim against Adidas under the TVPA.

## 3. Supplemental Jurisdiction

■ The supplemental jurisdiction statute, 28 U.S.C. § 1367, does not provide an independent source of federal jurisdiction. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 n. 4 (9th Cir.1988). Thus, in order to keep Adidas in this case under section 1367, plaintiffs must be able to establish subject matter jurisdiction for their claims against the Chinese government defendants.

■ The only potential basis for jurisdiction over the Chinese government defendants is the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1391(f), and 1602–1611 ("FSIA"). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).[7] Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of the United States courts," and "unless a specified exception applies, a federal court lacks subject matter jurisdic-

tion over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

■ Each of the Chinese government defendants falls within the definition of "foreign state" under the FSIA. *See* 28 U.S.C. § 1603(a), (b). The only exception to sovereign immunity implicated by plaintiffs' claims in this case is the commercial activities exception, 28 U.S.C. § 1602. That exception to foreign state immunity permits jurisdiction where "the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" *Id.* § 1605(a)(2). Thus, two elements must be satisfied for jurisdiction to be present: the foreign sovereign's acts must (1) be commercial; and (2) have a direct effect in the United States.

■ The commercial character of an activity is determined "by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 16 U.S.C. § 1603(d). Claims based on allegedly wrongful acts that are "peculiarly sovereign in nature" do not fall within the commercial activity exception to the FSIA. *Nelson*, 507 U.S. at 361, 113 S.Ct. 1471. "[W]hen a foreign government acts, not as regulator of the market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

---

7. The FSIA provides that "[t]he district courts shall have original jurisdiction [ ] over any nonjury civil action against a foreign state [ ] as to any claim for relief in personam with respect to any which the foreign state is not entitled to immunity under either sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330. A foreign state includes an agent or instrumentality of a foreign state. 28 U.S.C. § 1603.

The allegedly unlawful incarceration and mistreatment of plaintiffs in prison by the Chinese government arises out of an alleged abuse of China's police power. In *Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), the Supreme Court concluded that Saudi Arabia's wrongful arrest, imprisonment and torture of a United States citizen working at a Saudi hospital could not be considered commercial for the purposes of the commercial activities exception to the FSIA. *Id.* at 361, 113 S.Ct. 1471. The *Nelson* Court held that the conduct:

> boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood ... as peculiarly sovereign in nature. Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.

*Id.* at 361–62, 113 S.Ct. 1471. The same logic applies in the instant case. Accepting as true that products of Chinese forced prison labor are being imported into the United States, the operation of the Chinese judicial and penal systems is still not a commercial activity within the meaning of the FSIA. *See Unocal*, 963 F.Supp. at 888 ("Because plaintiffs essentially allege that [the Burmese government defendants] abused their police power, the foreign sovereign defendants' acts that form the basis of plaintiffs' claims are 'peculiarly sovereign in nature' and do not come within the commercial activity exception of the FSIA."). This Court is therefore without jurisdiction over claims arising from these state activities.[8]

Even if plaintiffs' claims were based on "commercial activities," this Court would lack jurisdiction because plaintiffs cannot demonstrate that the challenged acts of the Chinese government defendants had a "direct effect" in the United States. Under the caselaw addressing section 1603(d), an effect is not "direct" for the purposes of the exception unless it "follows as an immediate consequence of the defendant's ... activity." *Weltover, Inc.*, 504 U.S. at 618, 112 S.Ct. 2160.

In *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C.Cir.1994), the plaintiff argued that a "direct effect" in the United States resulted from his work as a slave overseas because he worked for companies directly supporting the Nazi war effort against the United States. The court disagreed:

> A 'direct effect' ... 'is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.' Many events and actors necessarily intervened between any work that Mr. Princz performed [in Poland and Germany] and any effect felt in the United States.

*Id.* at 1172 (quoting *Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd mem* 607 F.2d 494 (D.C.Cir.1979)). The *Princz* holding comports with a recent Ninth Circuit case, *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir.1997). The *Adler* court found that:

> [M]ere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a 'direct effect.' Rather, courts often look to the

---

8. It is also clear that the Act of State doctrine would apply to the actions of the Chinese government defendants. *See W.S. Kirkpatrick v. Environmental Tectonics Corp.*, 493 U.S. 400, 405, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (Act of State doctrine applies to situations where the relief sought requires "a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.").

place where legally significant giving rise to the claim occurred in determining where a direct effect may be said to be located.

*Id.* (citations omitted).

In the instant case, all of the legally significant acts giving rise to plaintiffs' claims occurred in China, not in the United States. In addition, there are a number of events and actors that intervene between the time the soccer balls were stitched in the Chinese prison system and the time the soccer balls were sold in America. Plaintiffs cannot, therefore, satisfy the "direct effect" requirement of the commercial activity exception, and Adidas' motion to dismiss must be granted.

## C. Bank of China's Motion to Dismiss

The Bank of China moves to dismiss the first amended complaint on the grounds that (1) this Court lacks subject matter jurisdiction over this action; and (2) this Court lacks personal jurisdiction over the Bank.[9]

### 1. Subject Matter Jurisdiction

■■■■ As an "agent or instrumentality" of China, the Bank is a "foreign state" within the purview of the FSIA. 28 U.S.C. § 1603. The FSIA therefore supplies the exclusive basis of jurisdiction, or determining lack of jurisdiction, of any claim

9. Because the Bank's first argument (subject matter jurisdiction) is dispositive, the Court will not reach the issue of personal jurisdiction over the Bank.

10. Plaintiffs also assert that the Bank waived its immunity in connection with actions on notes and bonds offered for sale in the United States. This argument relies on a page from the Registration Statement filed with the SEC in 1994, which includes a paragraph that appoints an agent for service of process upon the Bank

in any suit, action or proceeding arising out of or based on the Notes or Bonds or this

against the Bank. As with the Chinese government defendants, plaintiffs argue that the "direct effect" prong of the commercial activities exception to the Bank's immunity applies. *See* 28 U.S.C. § 1605(a)(2).

■■■■ In this case, the "acts" that are the basis of plaintiffs' claims are the acts of Chinese authorities operating or supervising labor camps. As held above, those acts are not commercial. Even assuming that if the acts were commercial in character, there is no direct connection between the presumed Bank involvement in foreign exchange transactions and plaintiffs' injuries in labor camps in China. Hence, there is "no substantive nexus that satisfies the 'based upon' requirement contained in [28 U.S.C. § 1605(a)(2)]." *Federal Insurance Co. v. Richard I Rubin & Co.,* 12 F.3d 1270, 1291 (3d Cir.1993). This Court is therefore without jurisdiction over plaintiffs' claims against the Bank, and will accordingly grant the Bank's motion to dismiss.[10]

## III. CONCLUSION

For the above-mentioned reasons, defendants' motions to dismiss the first amended complaint are granted. An appropriate Order accompanies this Opinion.

Agreement which may be instituted in any United States Federal or New York State court located in the Borough of Manhattan, The City of New York by the holder of any Note or Bond or the Fiscal Agent and the Issuer expressly accept the jurisdiction of any such court in respect of any such proceedings.

The cited waiver is limited to proceedings brought in New York by "holders" of the Notes or Bonds that "aris[e] out of or based on the Notes or Bonds" of the Fiscal Agency Agreement. Plaintiffs' claim for jurisdiction on this basis is therefore without merit.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Adidas' Motion to Dismiss is **GRANTED;** it is further

**ORDERED** that the Bank of China's Motion to Dismiss is **GRANTED.** This case is therefore **DISMISSED.** This is a final appealable Order.

## MEMORANDUM OPINION

Pending before this Court is the plaintiffs' Motion for Amendment of Judgment of the Court's Memorandum Opinion and Order of August 28, 2000, dismissing the above captioned case for lack of subject matter jurisdiction. Upon careful consideration of the plaintiffs' motion, the oppositions thereto,[1] and the entire record, the Court will deny the plaintiffs' motion.

## I. BACKGROUND

This case is a proposed class action lawsuit brought against the Chinese Politburo, Politburo Chairman Li Peng, the Bank of China (in New York) and several corporate branches of Adidas. The first amended complaint names four Chinese citizens as potential class representatives for this suit and seeks to represent a class of between 2,000 and 200,000 Chinese citizens who have been imprisoned in Chinese labor camps and allegedly forced to make Adidas soccer balls. Plaintiffs allege that the Chinese government imprisoned them without due process of law and forced them to engage in prison labor, including the production of soccer balls, allegedly bearing the Adidas logo. Plaintiffs additionally allege that defendants and the Chinese government had a business rela-

tionship that granted Adidas access to this prison labor. Plaintiffs brought claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"); the Torture Victim Protection Act, 28 U.S.C. § 1350, note ("TVPA"); and the supplemental jurisdiction statute, 28 U.S.C. § 1367. In the Memorandum Opinion of August 28, 2000, this Court granted defendants' motion to dismiss these claims, based upon a lack of subject matter jurisdiction.

## II. DISCUSSION

### A. Standard of Review

■■■ A motion brought pursuant to Federal Rule of Civil Procedure 59(e) gives the Court discretionary authority to reconsider an earlier ruling when there has been an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Anyanwutaku v. Moore,* 151 F.3d 1053, 1057–58 (D.C.Cir.1998) (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir.1996) (*per curiam* )) (other citations omitted). " [A] motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled.... A court will grant a motion to reconsider only if the moving party can present new facts or clear errors of law that compel a change in the court's prior ruling.' " *Assassination Archives & Research Center v. CIA,* 48 F.Supp.2d 1 (D.D.C.1999) (quoting *Amoco Prod. Co. v. Fry,* 908 F.Supp. 991, 994 (D.D.C.1995), *rev'd on other grounds,* 118 F.3d 812 (1997)).

### B. Analysis

■■■ In a thirteen-page motion with many assertions and scant legal authority,

---

1. Despite the plaintiffs' representation to the Court in a praecipe filed September 25, 2000 that they would file a reply brief by September 29, 2000, no reply has been filed. Be-

cause the time under Local Rule 7.1(d) has expired, the Court will rule on this pending motion.

the plaintiffs appear primarily to challenge the Court's determination that defendants were foreign states under the Foreign Sovereign Immunities Act for the purposes of rejecting supplemental jurisdiction over Adidas and that the alleged conduct of defendants does not rise to the level of egregiousness required under the private actor prong of the Alien Tort Claim Act. In this motion, plaintiffs have alleged no intervening change of law, have failed to present any new evidence that was not previously available and which would alter this Court's conclusions,[2] and have failed to establish a clear error of law or fact in the Court's previous Opinion. In that Opinion, the Court addressed the issues raised in this motion, outlining in great detail the governing law and the rationale underlying the Court's decision. The plaintiffs therefore have failed to make the requisite showing for reconsideration under Rule 59(e). *See Firestone,* 76 F.3d at 1208.

## III. CONCLUSION

For the reasons stated above, the Court will deny the plaintiffs' motion for reconsideration. An appropriate Order will accompany this Opinion.

---

**2.** In the praecipe filed on September 25, 2000, the plaintiffs stated that they would file extracts from the United States Senate hearings pertaining to trade relations with China on September 27, 2000. The Court has received no such filing.